William LINDSEY, Administrator of
the Estate of Vickie Jean Lindsey,
deceased, Plaintiff-Appellee,

v.

MIAMI DEVELOPMENT CORPORA-
TION, Defendant-Appellee,

and

Troy Lee Castile, Defendant-Appellant.

Supreme Court of Tennessee,
Eastern Section, at Knoxville.

May 6, 1985.

Darryl G. Lowe, Kennerly, Montgomery & Finley, Knoxville, for defendant-appellant.

Robert S. Olive, Olive & Olive, P.C., Knoxville, for plaintiff-appellee.

DROWOTA, Justice.

Plaintiff brought this action against the Defendants Miami Development Corporation and Troy Lee Castile for the wrongful death of his daughter upon the theories of (1) negligent maintenance of the premises and (2) negligent failure to take immediate steps to get proper medical aid and assistance for his daughter when the Defendant Castile knew, or should have known, by the exercise of due care, that medical attention was needed immediately. The trial court granted the Defendants a summary judgment as to both of the Plaintiff's contentions.

The Court of Appeals affirmed the trial court's ruling on premises liability but reversed as to the Defendant Castile in the "failure to render aid" issue. Specifically, the Court of Appeals determined that Castile owed the decedent a duty to exercise reasonable care to render her aid in her helpless condition and found that there was a genuine issue concerning material facts in regard to Castile's conduct after Ms. Lindsey was injured. Accordingly, the case was remanded to the trial court for trial as to the Defendant Castile.

On July 23, 1980, Castile hosted a political fund raiser in a building owned by the

Miami Development Corporation. Castile leased part of the building for living quarters. The decedent, Vickie Lindsey, attended the political fund raiser. She was observed sitting on the edge of a balcony which overlooked a stone foyer and steps with her feet dangling, yelling in a loud voice for Castile. When Castile appeared, she told him that she wanted to come down. Castile told her to go back the way she came and to come down the stairs. The decedent refused. She told Castile, "I'm coming down," and allegedly jumped, striking her head on the stone steps below the balcony. A blood sample later taken from Ms. Lindsey revealed that she had a blood alcohol content of 0.23%.

The record does not clearly establish the time when the decedent allegedly jumped. Castile testified that someone called an ambulance immediately. Shelia Julian testified that five minutes after Ms. Lindsey was injured she called Baptist Hospital and was told by a nurse to check the decedent's pulse and breathing and to call back if she did not regain consciousness in thirty minutes. There is a factual dispute as to the amount of time which elapsed before an ambulance arrived and medical assistance was rendered to the decedent. There is evidence in the record which indicates that Castile told the people around Ms. Lindsey after she was injured to "wait a while before you call an ambulance."

The ambulance service records establish that an ambulance was called at 2:19 a.m. and arrived at the scene at 2:28 a.m. The ambulance attendants were in contact by radio with Dr. Roy Parsons who was working in the Baptist Hospital emergency room that evening. When the attendants arrived, Ms. Lindsey was unconscious and her left pupil was dilated. At 2:32 a.m. Ms. Lindsey stopped breathing and the paramedics intravasated her. At 2:58 a.m. Ms. Lindsey arrived at the emergency room and was examined by Dr. Parsons. Both of her pupils were dilated and the cardiac monitor indicated that she had no cardiac activity. Dr. Parsons determined that Ms. Lindsey had sustained a basilar skull fracture and pronounced her dead at 3:00 a.m. An au-

topsy was never performed on Ms. Lindsey. Dr. Parsons testified that without the information that an autopsy would have provided in regard to the brain injury sustained by Ms. Lindsey, any opinion as to whether the decedent would have survived if she had received immediate medical care would be speculative.

Castile has appealed to this Court asserting that: (1) he owed no duty to render aid to Ms. Lindsey when she was unconscious and helpless; (2) that if he had such a duty, he satisfied that obligation by aiding the decedent; and (3) if there had been a breach of duty, it was not the proximate cause of Ms. Lindsey's death.

Summary judgment is to be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." T.R.C.P. 56.03. "The court's role in ruling on the motion is similar to its role in ruling on a motion for a directed verdict, and it must view the . . . evidence before it in the light most favorable to the opponent of the motion." *Stone v. Hinds*, 541 S.W.2d 598 (Tenn.App.1976).

■ It is axiomatic that three elements are necessary for the existence of a cause of action for negligence: (1) a duty of care owed by the defendant to the plaintiff; (2) a breach of that duty by the defendant; and (3) an injury to the plaintiff which was proximately caused by the defendant's breach of a duty. *Ruth v. Ruth*, 213 Tenn. 82, 372 S.W.2d 285 (1963). "A duty, in negligence cases, may be defined as an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another." Prosser and Keeton, Torts, § 53, p. 356 (5th ed., 1984) ("Prosser"). The court's role in determining whether a duty exists has been defined as follows:

> *The Existence of a Duty.* In other words, whether, upon the facts in evidence, such a relation exists between the

parties that the community will impose a legal obligation upon one for the benefit of others—or, more simply, whether the interest of the plaintiff which has suffered invasion was entitled to legal protection at the hands of the defendant. This is entirely a question of law, to be determined by reference to the body of statutes, rules, principles and precedents which make up the law; and it must be determined only by the court ... A decision by the court that, upon any version of the facts, there is no duty, must necessarily result in judgment for the defendant. A decision that if certain facts are found to be true, a duty exists, leaves open the other questions now under consideration [concerning the existence of negligence]. Prosser, § 37, p. 236.

The Defendant Castile asserts that the common law recognizes no general duty to aid a person in peril. *See Osterlind v. Hill*, 263 Mass. 73, 160 N.E. 301 (1928). It cannot be denied that courts have been slow to recognize a duty to render aid to a person in peril. *Farwell v. Keaton*, 396 Mich. 281, 240 N.W.2d 217 (1976); *see Yania v. Bigan*, 397 Pa. 316, 155 A.2d 343 (1959). This reluctance to recognize such a duty in situations in which aid can be rendered without exposure to danger and with little, if any, effort, has been subjected to extensive criticism by legal commentators. Prosser has noted that "[s]ome of the decisions have been shocking in the extreme" and that "[t]he remedy in such cases is left to the 'higher law' and the 'voice of conscience' which, in a wicked world, would seem to be singularly ineffective either to prevent harm or to compensate the victim." Prosser, § 56 at p. 375.

While paying lip-service to the common law rule that a stranger owes no duty to render aid to another in peril, courts have recognized that such a duty exists where some special relationship between the parties has afforded a justification for the creation of such a duty. "Thus, a carrier has been required to take reasonable affirmative steps to aid a passenger in peril and an innkeeper to aid his guest ... [T]here is now quite a general tendency to extend the same duty to any employer when his employee is injured or endangered in the course of his employment." Prosser § 56, p. 376. Moreover, courts have determined that the relationship between an invitee on premises open to the public and the possessor of the premises justifies the creation of such a duty.[1] *Personal Representative of the Estate of John Starling & Fisherman's Pier, Inc.*, 401 So.2d 1136 (Fla.App.1981); *Depue v. Flateau*, 100 Minn. 299, 111 N.W. 1 (1907); *Hovermale v. Berkeley Springs Moose Lodge No. 1483*, 271 S.E.2d 335 (W.Va. 1980). Other courts have determined that a social guest-host relationship creates a duty to render aid.[2] *Grimes v. Hettinger*, 566 S.W.2d 769 (Ky.App.1978); *see Hutchinson v. Dickie*, 162 F.2d 103 (6th Cir. 1947).

It is important to note that the duty to render aid as created by such relationships is a duty to use reasonable care under the circumstances. "He [the defendant] is not required to give aid to one whom he has no reason to know to be ill. He will seldom be required to do more than give such first aid as he reasonably can, and take reasonable steps to turn the sick person over to a doctor or to those who will look after him until one can be brought." Prosser, § 56 at p. 377; *see Coccarello v.*

---

1. One court has rejected the distinction made by the common law between non-feasance and misfeasance and found a duty to render aid when no relationship existed between the person injured and the defendant. *Soldano v. O'Daniels*, 190 Cal.Rptr. 310, 141 Cal.App.3d 443 (1983) (defendant's bartender refused to allow a good samaritan to use the bar's phone, which was available for the use of its patrons, to call the police in an attempt to aid the decedent who

had been threatened by someone in another drinking establishment across the street.)

2. The distinction between an invitee and a social guest has been abrogated in Tennessee in premises liability cases. The person in possession of the property owes the same duty to exercise reasonable care to invitees and to social guests. *Hudson v. Gaitan*, 675 S.W.2d 699 (Tenn.1984).

*Round Table of Coral Gables, Inc.,* 421 So.2d 194 (Fla.App.1982).

■ The evidence in the record establishes that the decedent was a guest at the party hosted by the Defendant. We find that there was a social guest-host relationship between Ms. Lindsey and the defendant which created a duty on his part to exercise reasonable care to render aid to her when Castile knew or should have known that Ms. Lindsey was seriously injured.

■ We note that even if no relationship had existed between Ms. Lindsey and the Defendant, the Defendant assumed control of the situation which placed him under the obligation to exercise reasonable care to render aid to Ms. Lindsey. There is proof in the record that Castile instructed people at the party after Ms. Lindsey had been seriously injured "to wait a while before you call an ambulance." Such conduct on the part of Castile triggered a rule of law which was defined by the Court in *Farwell v. Keaton, supra,* as follows:

> "Without regard to whether there is a general duty to aid a person in distress, there is a clearly recognized legal duty of every person to avoid any affirmative acts which may make a situation worse. '[I]f the defendant does attempt to aid him, and takes charge and control of the situation, he is regarded as entering voluntarily into a relation which is attended with responsibility. Such a defendant will then be liable for a failure to use reasonable care for the protection of the plaintiff's interests.' Prosser, *supra.*, § 56, pp. 343–344. 'Where performance clearly has been begun, there is no doubt that there is a duty of care.'" *Id.* 240 N.W.2d at p. 220.

In *Slater v. Illinois Cent. R. Co.,* 209 F. 480 (M.D.Tenn.1911), the decedent was a trespasser on a train who fell under its wheels, suffering an amputated leg and severe cuts on his other leg. The defendant railroad took him from the accident site and left him in a boxcar on a siding, far removed from others who could have rendered assistance. Despite the decedent's repeated requests for hospitalization, he was left alone for hours without medical attention. The decedent could have been saved by prompt medical care. He bled to death before the railroad delivered him to a hospital. The court found that by assuming control over the decedent, the railroad owed him a duty to exercise reasonable care to render aid to him and found it liable for his wrongful death. *See also Zelenks v. Gimbel Bros., Inc.,* 158 Misc. 904, 287 N.Y.S. 134 (1935). The evidence before this Court, viewed in a light most favorable to the Plaintiff, supports an inference that by instructing the guests to "wait a while before you call an ambulance," Castile assumed control of the decedent and became obligated to exercise reasonable care in rendering aid to her so as to not make her situation worse.

■ The Defendant Castile relies upon T.C.A. 63–6–218, the Good Samaritan law, which provides that anyone who, in good faith, renders emergency care to a person at a gathering open to the general public shall not be liable for any civil damages as a result of any act or omission by such person except for such damages as may result from that person's gross negligence. The purpose of Good Samaritan statutes is to induce voluntary aid by removing the fear of potential liability which acts as an impediment to that conduct. Thus Good Samaritan statutes are directed toward persons who are not under some pre-existing duty to remedy aid. *Lee v. State,* 490 P.2d 1206 (Alaska 1971). Accordingly, it has been held that a Good Samaritan Act does not protect a defendant who had a pre-existing duty to render aid to the plaintiff. *Lee v. State, supra.* Since it has been determined that Castile had a relationship with Ms. Lindsey which placed him under a duty to render aid to her after she was injured, the Good Samaritan law affords Castile no protection in the case at bar.

■ Having determined that Castile owed the decedent a duty to exercise reasonable care in rendering her aid, we have closely reviewed all of the evidence before the Court in a light most favorable to the

Plaintiff. Clearly, there is a dispute as to material facts in regard to Castile's conduct after the decedent was injured. Although Castile testified that he immediately told someone to call an ambulance, there is proof in the record that he told his guests to wait a while before calling an ambulance. There is also proof in the record that a substantial period of time elapsed between the Plaintiff's injury and the arrival of an ambulance. Under the facts before us, reasonable minds could reach different conclusions as to whether Castile breached the duty he owed the decedent. Accordingly, this issue must be resolved by the jury.

■■■ Castile argues that his conduct was not the proximate cause of Ms. Lindsey's death. In *Wyatt v. Winnebago Industries, Inc.*, 566 S.W.2d 276 (Tenn.App. 1978) the Court noted that:

"Proximate cause, of course, is a concept that was developed in the law of negligence. *See Prosser, supra.*, §§ 41–45. It's first requirement is that the defendant's act ... be a cause in fact of the injury. *See Prosser, supra.*, 941. This means simply that the circumstances must be such that the injury would not have occurred but for [the defendant's conduct]."

The issue is whether Castile's breach of his duty to render aid was a "cause in fact" of Ms. Lindsey's death. In a breach of a duty to render aid situation, the plaintiff has the burden of proving that the defendant's breach of duty aggravated the decedent's condition. "In order for the plaintiff in this case to maintain her cause of action in the face of a Motion for Judgment on the Evidence at the close of her case-in-chief, it was necessary that she present evidence of probative value that there was an aggravation of injuries, following decedent's fall on the stairs, which could have been prevented by immediate aid." *Palace Bar, Inc. v. Fearnot*, 269 Ind. 405, 381 N.E.2d 858, 866 (1978); *see also Steckman v. Silver Moon*, 77 S.D. 206, 90 N.W.2d 170 (1959).

■■■ The only medical proof in the record is the testimony of Dr. Roy B. Parsons, Jr., the physician who treated Ms. Lindsey in the Baptist Hospital emergency room. The pertinent portion of Dr. Parson's testimony follows:

"Q. All right, do you hold any opinions as to whether or not a delay of any specified perior of time would have made any difference in the final analysis?

A. I can only speculate because we don't have the final information which an autopsy would have provided as to where exactly the injury to the brain was, how extensive it was and whether it was an injury which would—in any event be non-survivable, whether it would be just a few hours or maybe a day or two."

. . . .

Q. With the history of a patient as Vickie Lindsey had the history of there of being unconscious after the fall and moaning and with only one eye dilated, would that be such a condition that could be salvageable had it been caught at the hospital if the person had been at the hospital in time?

A. This is something that we can only speculate in. I have seen patients come in like this and be able to—to help them, and sometimes they've recovered.

The above testimony is speculation and, as such, is not evidence which establishes proximate cause. As Prosser notes:

"The plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant ...

The plaintiff is not, however, required to prove the case beyond a reasonable doubt. The plaintiff need not negative entirely the possibility that the defendant's conduct was not a cause and it is enough to introduce evidence from which reasonable persons may conclude that it

is more probable that the event was caused by the defendant than that it was not ...'" Prosser, § 41, p. 269.

"A doctor's testimony that a certain thing is *possible* is no evidence at all. His opinion as to what is possible is no more valid than the jury's own speculation as to what is or is not possible. Almost anything is possible, and it is thus improper to allow a jury to consider and base a verdict upon a 'possible' cause of death." *Palace Bar, Inc. v. Fearnot*, 269 Ind. 405, 381 N.E.2d 858, 864 (1978). "The mere possibility of a causal relationship, without more, is insufficient to qualify as an admissible expert opinion." *Kirschner v. Broadhead*, 671 F.2d 1034, 1039 (7th Cir.1982).

> The admissibility of an expert medical opinion, of course, should not turn on whether the testifying physician characterizes a particular potential cause of an injury as "conceivable," "possible" or "probable." *See Trapp v. 4–10 Investment Corp.*, 424 F.2d 1261, 1268 (8th Cir.1970). Regardless of the term employed, if the physician's
>
>> "testimony is such in nature and basis of hypothesis as to judicially impress that the opinion expressed represents his professional judgment as to the most likely one among the possible causes of the physical condition involved, the court is entitled to admit the opinion and leave its weight to the jury." *Norland v. Washington General Hospital*, 461 F.2d 694, 697 (Cir. 8, 1972).
>
> Nevertheless, a mere possibility is not an affirmative basis for a finding of fact. "In the language of the law of evidence, [a medical opinion suggesting] that which is merely possible, standing alone and not offered as auxiliary or rebuttal testimony is immaterial to the ascertainment of the fact and so is inadmissible as evidence of that fact." *Martin v. United States*, 284 F.2d 217, 219 (D.C.Cir., 1960). *Kirschner v. Broadhead, supra*, 671 F.2d at p. 1039–1040.

Dr. Parson's testimony as quoted above is speculative by his own admission and inad-

missible. There is no admissible proof in the record as to the issue of proximate cause. However, our review of the record reveals that the proximate cause issue was not raised in the Defendant Castile's Motion for Summary Judgment. There is no indication in the record that the trial court resolved this issue. Accordingly, this issue is remanded to the trial court. The Plaintiff shall be given thirty days in which to prepare and admit any evidence which meets the standards set forth in Rule 56 in regard to the proximate cause issue. The trial court can then rule on this issue in accordance with the guidelines set forth above.

■ The Plaintiff asserts that the Court of Appeals erred in affirming the trial court's granting of summary judgment on his premises liability claim. The Plaintiff acknowledges that the only testimony in the record describing how Ms. Lindsey descended from the balcony is the Defendant Castile's testimony that she jumped but argues that it is not appropriate for summary judgment to be granted because the testimony of other witnesses contradicts some of the other testimony of Castile and Castile can thus be impeached. It is true that Castile's testimony is not entirely consistent with that of Angela Williams and Shelia Julian in collateral matters; however these three witnesses who were in the foyer under the balcony prior to, during and after Ms. Lindsey's descent are consistent on the details of the conversation which occurred between Ms. Lindsey and the Defendant Castile just prior to her descent. The testimony of these witnesses establishes that the balcony was surrounded with plants and the decedent had moved some plants so she could sit down on the balcony. She was sitting on the edge of the balcony with her feet hanging off, talking to Castile who was on the stone steps below. She told Castile that she wanted to come down. Castile told her not to. He told her to get up and come down the stairs. She refused to and said: "I'm coming down." Troy Castile testified that Ms. Lindsey jumped. The other two witnesses did not see Ms. Lindsey jump but their

testimony verifies the conversation which occurred between the decedent and Castile. Angela Williams testified she heard the decedent fall for she was only three or four feet from her. No issue has been seriously raised as to Castile's credibility on the factual issue described above. Reasonable minds can draw only one conclusion from the evidence in the record, that Ms. Lindsey jumped from the balcony and that she and she alone caused her initial injury. There is no proof in the record which has been pointed out by the Plaintiff or which has been revealed by our extensive examination of the record which supports any inference that Ms. Lindsey fell from the balcony because of a nonexistent or defective railing.

> [T]he party opposing summary judgment must be able to point to some facts which may or will entitle him to judgment, or refute the proof of the moving party in some material portion, and ... the opposing party may not merely recite the incantation, "Credibility," and have a trial on the hope that a jury may disbelieve factually uncontested proof. *Curi v. International Business Machines Corporation*, 517 F.2d 212, 214 (5th Cir.1975) *quoting with approval Rinieri v. Scanlon*, 254 F.Supp. 469, 474 (S.D.N.Y.1966).

In summary, we affirm the Court of Appeals' finding that the trial court properly granted summary judgment on the premises liability issue. We have found that a social guest-host relationship existed between Ms. Lindsey and the Defendant Castile, which created a duty on his part to exercise reasonable care to render aid to her when he knew or should have known that she was seriously injured. We further found that a dispute exists as to material facts in regard to Castile's conduct after Ms. Lindsey was injured. Whether Castile exercised reasonable care under the circumstances, was not an issue to be decided upon summary judgment. The issue of whether Castile's conduct was the proximate cause of Ms. Lindsey's death was not decided by the trial court and is therefore remanded for a determination of that issue in accordance with the guidelines set out in this opinion.

The costs of this appeal are taxed to the defendant Castile.

COOPER, C.J., and FONES, BROCK and HARBISON, JJ., concur.