WILLIAM BAUMGARDNER )
and wife, )
SUSAN BAUMGARDNER, )
)
    Plaintiffs/Appellants, )       Appeal No.
)       01-A-01-9806-CV-00307
v. )
)       Rutherford Circuit
ACD TRIDON NORTH AMERICA, )    No.  37471
INC., )
)
    Defendant/Appellee. )
)

FILED

September 23, 1998

Cecil W. Crowson
Appellate Court Clerk

COURT OF APPEALS OF TENNESSEE

APPEAL FROM THE CIRCUIT COURT FOR RUTHERFORD COUNTY

AT MURFREESBORO, TENNESSEE

THE HONORABLE ROBERT E. CORLEW, III, JUDGE

GUY R. DOTSON, JR.
102 South Maple Street
Murfreesboro, Tennessee  37130
    ATTORNEY FOR PLAINTIFFS/APPELLANTS

JOHN R. RUCKER, JR.
14 Public Square North
Murfreesboro, Tennessee  37130
    ATTORNEY FOR DEFENDANT/APPELLEE

AFFIRMED AND REMANDED

WILLIAM B. CAIN, JUDGE

# OPINION

This is an appeal by plaintiff from summary judgment rendered by the trial court in favor of the defendant in a personal injury case.

William Baumgardner and wife Susan Baumgardner are husband and wife plaintiffs in the case. ACD Tridon North America, Inc. is the defendant.

William Baumgardner was, at the time of the accident in this case, a long time employee and route driver for UPS. His delivery route was in Smyrna, Tennessee and involved driving 80 to 100 miles a day and making 95 to 120 stops per day. He also averaged about 15 pickups per day. Among the customers on his route for many years was the defendant Tridon. He had been making pickups at Tridon for four or five years prior to the date of the accident in question.

The plaintiffs' complaint asserts:

4. At all times mentioned herein, Plaintiff, WILLIAM BAUMGARDNER was employed by United Parcel Service as a package deliveryman and duties included picking up and delivering packages to Defendant.

5. On November 6, 1995, Plaintiff, WILLIAM BAUMGARDNER was picking up packages from Defendant as a business invitee by using Defendant's self propelled hand jack up and down defendant's ramp.

6. On the above date as Plaintiff, WILLIAM BAUMGARDNER was travel[l]ing down defendant's ramp with Defendant's self propelled hand jack, Plaintiff, WILLIAM BAUMGARDNER lost control of the hand jack, was knocked of[f] balance and did fall causing personal injury.

7. It was the duty of the Defendant to design, build, keep and maintain the above described ramp in a condition reasonably safe for its intended uses and free from all defects and conditions which would render it dangerous and unsafe for Plaintiff, WILLIAM BAUMGARDNER, or present an unreasonable risk of harm to him in his lawful use of the ramp.

8. It was the duty of the Defendant to instruct Plaintiff, WILLIAM BAUMGARDNER, on the proper use of the self propelled hand jack.

9. Defendant was negligent in that they failed to perform the above described duties and as a proximate result thereof, Plaintiff, WILLIAM BAUMGARDNER was knocked off balance and fell and was injured.

The Law

The Tennessee Supreme Court has said:

It is axiomatic that three elements are necessary for the existence of a cause of action for negligence; (1) a duty of care owed by the defendant to the plaintiff; (2) a breach of that duty by the defendant; and (3) an injury to the plaintiff which was proximately caused by the defendant's breach of a duty.

*Lindsay v. Miami Dev. Corp.*, 689 S.W.2d 856, 858 (Tenn. 1985).

No claim for negligence can succeed in the absence of: 1) duty, 2) breach of that duty, 3) injury or loss, 4) causation in fact, and 5) promixate cause. *McClenahan v. Cooley*, 806 S.W.2d 767 (Tenn. 1991); *Bradshaw v. Daniel*, 854 S.W.2d 865 (Tenn. 1993).

In the context of a negligence action against a landowner, the summary by Justice Henry two decades ago remains essentially viable.

[1,2] Owners and occupiers of land have an obligation to exercise ordinary care and diligence in maintaining their premises in a safe condition for invitees. *Paradiso v. Kroger Co.*, 499 S.W.2d 78 (Tenn.App.1973). Proprietors are under an affirmative duty to protect invitees, among them business visitors, not only against dangers of which they know but also against those which with reasonable care they might discover. *Illinois Central Railroad Co. v. Nichols*, 173 Tenn. 602, 118 S.W.2d 213 (1937).

*McCormick v. Waters,* 594 S.W.2d 385, 387 (Tenn. 1980).

The duty of the defendant being thus settled, the next inquiry is as to whether or not there is any evidence in the record to establish a breach of that duty by the defendant.

Summary judgment having been granted in the trial court to the defendant, this court, on appeal, must take the strongest legitimate view of the evidence in favor of the appellant (*Downen v. AllState Ins. Co.,* 811 S.W.2d 523 (Tenn. 1991)), and if reasonable minds might differ or there is uncertainty as to whether or not reasonable minds might differ as to material facts (*Evco Corp. v. Ross*, 528 S.W.2d 20, 25 (Tenn. 1975)), the court must then go further and apply the same standards to the issues of injury, cause in fact, and proximate cause. If reasonable minds could differ on all of these elements, then a grant of summary judgment is improper and the case must be remanded for trial on the merits.

In 1986, the United States Supreme Court decided *Anderson, Celotex, and Matsushita,* otherwise known as the "1986 Trilogy".

Seven years later, after a number of intermediate Tennessee Appellate Court decisions had pointed the way, the Tennessee Supreme Court essentially adopted the "1986 Trilogy". *Byrd v. Hall*, 847 S.W.2d 208 (Tenn. 1993).

Justice Brennan, dissenting on other grounds in *Celotex* but confirming the majority on the treatment of summary judgment correctly observed:

> Where the moving party adopts this second option and seeks summary judgment on the ground that the nonmoving party--who will bear the burden of persuasion at trial--has no evidence, the mechanics of discharging Rule 56's burden of production are somewhat trickier. Plainly, a conclusory assertion that the nonmoving party has no evidence is insufficient. See ante, at 328. 911 Ed 2d, at 277 (White, J., concurring). Such a 'burden' of production is no burden at all and would simply permit summary judgment procedure to be converted into a tool for harassment. See Louis 750-751. Rather, as the Court confirms, a party who moves for summary judgment procedure on the ground that the nonmoving party has no evidence must affirmatively show the absence of evidence in the record. Ante. At 323, 911 Ed 2d, at 273. This may require the moving party to depose the nonmoving party's witnesses or to establish the inadequacy

of inadequacy of documentary evidence.  If there is literally no evidence in the record, the moving party may demonstrate this by reviewing for the court the admissions, interrogatories, and other exchanges between the parties that are in the record.  Either way, however, the moving party must affirmatively demonstrate that there is no evidence in the record to support a judgment for the nonmoving party.

*Celotex v. Catrett*, 91 L.Ed.2d 265, 279.


### Breach of Duty


The record before the court on summary judgment consists of the summary judgment motion and the depositions of William Baumgardner and Gary White, an employee of the defendant.


While credibility of witnesses is not an issue before this court, it is well to take note of the candor and forthrightness of the plaintiff William Baumgardner.  Plaintiff, in his complaint, first asserts a duty of the defendant to design, build, keep and maintain the ramp in the condition reasonably safe for its intended uses and free from all defects and conditions which would render it dangerous and unsafe for the plaintiff or present an unreasonable risk to him in his lawful use of the ramp.


This assertion is a correct statement of the duty of the defendant and plaintiff then asserts a breach of that duty by the defendant.


Plaintiff offers no evidence at all as to any defective, dangerous, or unsafe condition of the ramp.  He testifies:

> Q.  Describe this ramp that you used to load your truck or to drive the hand jack down so you could load your truck.
> A.  I don't know what degree the ramp is.  It's a concrete ramp.  I guess it's approximately forty feet long.
> Q.  Is it a steep slope?
> A.  I don't know, sir.  I'm not an engineer.  I couldn't tell you.
> Q.  Just from a layman's standpoint, from your observations and the numerous times that you've used it, did you consider it to be steep?
> A.  Gosh, I don't know.  I guess it's fairly steep.
> Q.  Was it so steep that you considered it to be dangerously steep?

A.    No, sir.

Q.    It's made of concrete, is it not?

A.    I believe so.

Q.    Does it have any safety features on it?

A.    Not that I'm aware of.

Q.    Is it just a flat ramp?

A.    I believe it's primarily a flat ramp.  It may have a curb of so many inches on each side.

Q.    Does it, in fact, have curbs on each side?

A.    I believe maybe -- two or three inches maybe.

Q.    What was the condition of the ramp on the night that you were using it as far as its surface condition?

A.    Other than being wet, I don't recall.  It may have had gravel where the tow motors have come from the parking lot up the ramp.

Q.    It was raining that night, was it not?

A.    Yes, sir.

Q.    So the ramp was wet?

A.    Yes, sir.

Q.    You knew the ramp was wet when you were using it.  Is that true?

A.    Yes, sir.

Q.    Do you recall whether the ramp had any gravel on it or not?

A.    I don't recall.

Q.    Do you recall whether the ramp had any cracks in it?

A.    I don't recall that.

Q.    Do you ever recall seeing any cracks in the ramp?

A.    No.

Q.    Did the ramp have any mud on it since it was raining?

A.    Not that I was aware of.

Q.    Right at the end of the ramp, what is at the end of the ramp as it goes out into the parking lot?

A.    A gravelled parking lot.

Q.    Is it -- is there any grass or mud or dirt nearby the end of the ramp?

A.    Yes, sir.

Q.    Where is that located?

A.    It's just off to the side there.  Off to the side of the gravelled parking lot it's a grassy area.

Q.    If you're walking down the ramp, to your left would be the dock door; is that correct?

A.    Correct.

Q.    And what is to your right?

A.    The grassy area.

Q.    As you get down to the end of the ramp near the grassy area, is that worn out from where people have driven tow motors and other pieces of equipment there?

A.    It's just a gravelled lot.

Q.    Was there mud or rocks at the end of that ramp that night?

A.    There were rocks.  I don't -- I couldn't tell you about mud.

Q.    Did you back your truck up to the end of the ramp?

A.    Yes, sir.

Q.    How close was your truck to the end of the ramp?

A.    It was probably fifteen, twenty feet from the ramp in the parking area.

Q.    Would you drive the hand jack all the way to your truck or would your drive it to the end of the ramp and then carry the boxes

from the end of the ramp to your truck?

A. I would leave enough space there where the pallet jack or the skid of package could sit close to the back of the truck.

Q. On this particular night, since it was raining, did you drive the pallet of boxes down to the end of the ramp, leave them there and then drive the hand jack back up the ramp?

A. I took the first skid of packages down, loaded those onto my truck and then brought the empty skid back up the ramp and went to get the second skid.

Q. While you were loading the boxes off the skid, did you leave the hand jack in the rain or did you drive it back up?

A. It was in the rain. It was still sitting there.

Q. Was it dark by the time you got to Tridon?

A. Yes, sir.

Q. Are there any lights out there?

A. There are outside lights.

Q. Are there any lights in the ramp area?

A. Not that I recall.

Q. Was it well lit enough to where you could see what you were doing?

A. Just pretty much from the light coming out of the warehouse area where the door is, where the door was open.

Q. You don't recall any outside lights?

A. Not in that area.

Q. Was it your responsibility to load your own truck?

A. Yes, sir.

Q. Had you ever used that ramp on other occasions when it had been raining?

A. I don't recall any specific time, but I'm sure there is a possibility.

Q. On the night of the accident, did you consider the ramp to be slick since it was wet?

A. No, sir.

Q. On any other occasions that you might have used the ramp in the rain, did you ever find it to be slick?

A. No, sir.

Q. To your recollection, was there anything wrong with the ramp that night that contributed to your accident?

A. Not that I'm aware of.

Q. On the night of the accident, were you aware that rain would make a concrete ramp slick?

A. I'm aware of that, but I believe that ramp is grooved or it's a rough type surface where you can avoid that.

Q. Do you think the rain played any part in your accident at all?

A. I'm not aware. If it did, you know, it could have been a contributing factor, but I wouldn't say that that was the sole cause of the accident.

Q. But the ramp itself was either grooved or rough such that the rain wouldn't make it any more slick than it would be ordinarily. Is that true?

A. I believe so.

Q. To your knowledge, during all the times that you used that ramp, was there ever an occasion that it was not in good condition, properly maintained?

A. Just other than having gravel scattered on it. That's about it.

Q. Would the gravel be scattered down at the bottom where the parking lot is?

A.	No, just the entire length of it.  I guess the tow motors coming and going out of the gravelled parking lot would probably bring some up with them.

Q.	On this particular night, you don't recall there being any gravel on the ramp, though?

A.	No, I don't recall.

This very candid testimony by the plaintiff not only fails to provide material evidence of a breach of duty as to the condition and maintenance of the ramp, but further fails to establish that the ramp had any causal connection at all to his fall and resulting injuries.  Indeed, his testimony shows affirmatively that he has no evidence to support his claim of premises liability.

His second assertion of duty is that the defendant had a duty to instruct him in the use of the self propelled hand jack and failed to do so.

Assuming such a duty to exist, which is a doubtful assumption, there is simply no evidence in the record that the alleged failure to train had anything to do with the accident in issue.  Plaintiff had been using the same battery powered, self propelled hand jack for four to five years prior to the occurrence of this accident.

Plaintiff testified:

Q.	When your accident happened, were you walking down the ramp with the jack with the skid of boxes on it?

A.	Yes, sir.

Q.	And was the jack in front of you and you were walking behind it?

A.	Yes, sir.

Q.	Was that the same -- were you doing the same thing you had done on many other occasions?

A.	Yes, sir.

Q.	Was there anything different about this particular night than what you had done on any other occasion?

A.	No, sir.

Q.	What happened to cause the jack to get away from you?

A.	I don't know, sir, if there was too much weight on the skid.  I don't know, you know, if it just got haywire with me there.  I just lost control of it and it just pretty much jerked out of my hand there.  I couldn't control it.

Q.	Again, looking at the Complaint you have filed in this case, it stated that you were traveling down the ramp with a self-propelled hand jack and plaintiff, William Baumgardner, lost control of the hand jack, was knocked off balance and did fall, causing personal injury.  Is that a pretty good description of what took place?

A.	Yes, sir.

Q.	All right. When you lost control of the hand jack, did you let go of the handle so that it would pop up and stop the jack?

A.	Like I said, that happened so fast, I don't really recall. That may have been the case.

Q.	Did the hand jack at any time run over you?

A.	It may have. Like I say, it happened so quick. The next thing I knew, I was trying to stand up.

Q.	If the jack is in front of you and you're walking behind it, how could it run over you?

A.	The lever that comes back that I was holding onto with the controls on it, unless that thing could have swing, you know, and I went into it, I don't know really. It's a mystery to me.

Q.	Did you fall on the ramp?

A.	Yes.

Q.	When you fell, did you let go of the handle of the hand jack?

A.	Yes. All I remember, after it happened, I was on my back and I was trying to get up. So I'm sure at some point I did have to let go of it.


. . .


Q.	Mr. Baumgardner, were you in a hurry as you were coming down the ramp with this particular load?

A.	No, sir.

Q.	Are you certain that you were behind the jack at the time the accident happened?

A.	Yes, sir.

Q.	I may have asked you this before, but I just want to be sure. Can you offer any explanation as to what happened to cause this load to do different than all the rest of them you had taken down that ramp?

A.	I don't know, sir. I wouldn't have expected it to.

Q.	Was it a particularly big load?

A.	Just a normal-sized load, just an optimal size load for a skid there.

Q.	As you were going down the ramp, was it actually raining at that time or had it been raining and was sprinkling or misting? What was the condition of the rain?

A.	I believe it was sprinkling at the time.

Q.	Do you know of anything about the ramp or about the hand jack that caused you to lose control of the hand jack on that particular occasion?

A.	No, sir.

Q.	Was there anybody other than you who had total control of that hand jack?

A.	No, sir.


There is no material evidence in the record establishing proximate cause even if we assume a duty to train and a breach by the defendant of that duty.


Finally, in summary plaintiff testified:

Q. In the lawsuit that you filed against Tridon, you have alleged that they were in some way negligent or did something wrong to cause this accident. And what I would like for you to tell me just in your own words is what you feel Tridon did wrong or negligently to cause this accident.

A. Well, I would say I was never officially trained to use their equipment. Maybe the maintenance of the ramp possibly could have something to do with it. That's -- I guess that's the -- that's the main thing that I can think of right off at this time. That's --

Q. All right. You have mentioned that possibly the maintenance of the ramp may have had something to do with it. Was there anything about the ramp that you noticed that night that was a failure on their part to maintain that ramp?

A. Nothing that I noticed. Like I said, there could have been debris on the ramp that I wasn't aware of.

Viewing this case in the light most favorable to the non-moving plaintiff, this court presents only the fact that an injury has occurred. It is long settled in Tennessee that the mere fact than an injury has been sustained never raises a presumption of negligence. *Mullins v. Seaboard Coastline Railway Co.*, 517 S.W.2d 198, 201 (Tenn. App. 1974). The testimony of plaintiff shows that he has no evidence to sustain his action for non-instruction.

Conclusion

In this unfortunate accident, plaintiff has the burden of proving the elements of his cause of action. To survive summary judgment he must at least offer evidence upon which reasonable minds could differ. As to the ramp on which he fell, he has offered no evidence of a breach of duty by the defendants. As to the alleged failure to train in the use of the battery powered hand jack, even if one assumes a duty and a breach thereof, the record is devoid of any evidence under which reasonable minds could find proximate cause.

The judgment of the trial court in granting summary judgment for the defendant is affirmed.

_____
                                      WILLIAM B. CAIN, JUDGE
CONCUR:

_____
HENRY F. TODD, PRESIDING JUDGE, M.S.

_____
BEN H. CANTRELL, JUDGE