IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 21, 2011 Session

# RHEAETTA F. WILSON ET AL. v. AMERICARE SYSTEMS, INC., ET AL.

**Appeal from the Circuit Court for Bedford County**
**No. 10204      Franklin L. Russell, Judge**

---

**No. M2011-00240-COA-R3-CV - Filed January 5, 2012**

---

Decedent's next of kin filed this wrongful death action against an assisted living facility, two nurses, and the facility's management company for failure to provide proper care and treatment. This appeal concerns only the jury verdict and judgment finding the management company directly liable for failure to provide adequate staff at the assisted living facility. We find no material evidence to support a conclusion that any staffing deficiency proximately caused the decedent's death. We therefore reverse the judgment finding direct liability on the part of the management company.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which PATRICIA J. COTTRELL, P.J., M.S., and RICHARD H. DINKINS, J., joined.

Roger Wayne Dickson, Chattanooga, Tennessee; and David L. Johnson, Nashville, Tennessee; for the appellant, Americare Systems, Inc.

Alan Stuart Bean and Clarence James Gideon, Nashville, Tennessee; and Raymond Wilford Fraley, Jr., and Thomas Robertson Moncrief, Jr., Fayetteville, Tennessee; for the appellees, Lolly Watson and Rheaetta F. Wilson.

## OPINION

### FACTUAL AND PROCEDURAL BACKGROUND

This is a complex case involving allegations of negligence against an assisted living facility, several employees, and its management company. We will limit our recitation of the

facts to those necessary for an understanding of the issues presented in this appeal, which concern the direct liability of the management company.

Mable Frances Farrar was admitted to Celebration Way, an assisted living facility in Shelbyville, Tennessee, on October 13, 2003. The facility was operated by Shelbyville Residential, LLC, which had entered into a management agreement with Americare Systems, Inc. for Americare to provide management services for the facility. Mary Ann Steelman, a registered nurse, was the administrator of Celebration Way. Dottie Hunt, a licensed practical nurse, was the facility's director of nursing. All of the facility's other employees were unlicensed personnel.

At the time of her admission to Celebration Way, Ms. Farrar had a history of problems with constipation. On May 29, 2004, at the request of Ms. Farrar's physician, Ms. Steelman administered an enema to Ms. Farrar. Immediately thereafter, her condition deteriorated and she was taken to the emergency room, where she died that same night from a perforated bowel.

Ms. Farrar's daughters, Rheaetta Wilson and Lauralyn Watson, filed this action on October 29, 2004, against Americare, Shelbyville Residential, Ms. Hunt, and Ms. Steelman. The complaint includes allegations that the defendants deviated from accepted standards of care in numerous respects, including failing to provide "trained personnel sufficient in number and skill to provide necessary and adequate care" to Ms. Farrar and failing to provide her with care from a licensed nurse when she needed it. The plaintiffs requested both compensatory and punitive damages.

*Pretrial rulings*

The plaintiffs moved for summary judgment on all issues except for the amount of damages, and the defendants also moved for summary judgment. By orders entered on July 20, 2006, the trial court denied the defendants' motion and partially granted the plaintiffs' motion. The court determined that the plaintiffs were entitled to judgment in their favor as a matter of law on the following issues:

A. The defendants deviated from accepted standards of professional practice in failing to assess Mable Farrar.

B. The defendants deviated from accepted standards of professional practice in failing to appropriately and timely notify Alma Tamula, M.D., the attending physician for Mable Farrar.

C. The defendants deviated from accepted standards of professional practice in negligently administering enemas to Mable Farrar.

D. The defendants deviated from accepted standards of professional practice in failing to administer medications ordered by the attending physician.

The court declined to grant summary judgment on the issue of the causation of Ms. Farrar's death.

*Jury trial*

The case was tried before a jury over ten days in April 2010. Since the issues on appeal concern the direct liability of Americare—not its liability for the negligence of its employees—we will summarize only the testimony related to Americare's direct liability. By the time of trial, the plaintiffs' direct claims against Americare had been boiled down to the claim that Americare failed to provide adequate staff, thereby failing to provide Ms. Farrar with proper care and causing her death.

Ms. Steelman, the facility administrator, testified that she and Ms. Hunt were responsible for telephone communications with doctors concerning changes in the patients' medications. At the time of Ms. Farrar's admission in October 2003, her physician, Dr. Alma Tamula, ordered that she receive Miralax, a laxative, once a day. She also instructed the facility to contact her if Ms. Farrar became constipated again. According to Ms. Steelman's testimony, Ms. Hunt informed her in December 2003 or February 2004[1] that Dr. Tamula changed the Miralax prescription to "PRN" (meaning "whenever necessary"). Ms. Steelman admitted that she did not have a record of a telephone order from Dr. Tamula and that this change was not reflected on the medication regimen records.

Ms. Steelman testified that, based upon a telephone order received from Dr. Tamula after an office visit with Ms. Farrar on May 27, 2004, Ms. Steelman administered a molasses and milk enema to Ms. Farrar on May 27, 2004. She also testified about the sequence of events culminating in her administration of another enema to Ms. Farrar on the evening of May 29, 2004.

Large portions of Ms. Steelman's video deposition testimony were played as evidence at the trial. The following testimony, which occurred after questions concerning the inadequate record keeping at Celebration Way, relates to the facility's staffing levels:

---

[1]Ms. Steelman gave conflicting testimony as to the date of the alleged medication change.

Q. Can she [Maureen Meyer, Americare's regional operations director] hire people at your facility?

A. No, sir, that's left up to me.

Q. Can she hire and fire an administrator?

A. Yes, sir, that her–that's her job.

Q. Have you ever mentioned to Ms. Meyer that–in terms of the responsibilities that you and Ms. Hunt have, that it's too much for the level of staffing?

A. They are aware of it.

Q. My question was: Did you mention it to them?

A. Yes, sir.

Q. When did you begin letting them know that in terms of what you needed to do for the patients there just wasn't enough staff to get it done?

A. They've always been–I mean, they've always asked at the meetings what they could do to take some stuff off of us, but there's never been a solution to taking care of it.

Q. Before October 13, 2003, did you let the people at Americare Systems know that you didn't have enough staff to get the job done right for the patients?

A. Yes, sir.

Q. How did you communicate that information to them?

A. They just knew–they just know that our plate is very full. I mean . . .

Q. How did you communicate to Americare Systems that there was too much to do and too few staff to get the job done?

A. I discussed it.

Q. With whom?

A. With Ms. Meyers.

Q. Anybody else?

A. No, sir.

Q. Did you ever send her any memos?

A. No, sir.

Q. E-mails?

A. No, sir.

Q. Always face-to-face?

A. Yes, sir, or on the phone.

Q. Okay. And how did you communicate it to her? What examples did you give? What problems did you identify? How did you pass that message on to her?

A. Just that our workload is overwhelming sometimes.

Q. Okay. So why didn't you just add some more staff, get another licensed nurse?

A. It's not budgeted.

The following excerpt from Ms. Steelman's deposition testimony also relates to staffing levels:

Q. Well, have you made requests for additional licensed personnel, whether full-time or part-time, before October 13th, 2003?

A. No, sir.

Q. Never have?

A. No, sir.

Q. Have you made requests for additional licensed personnel after 10/13/03?

A. No, sir.

Q. Have you ever sought to hire additional licensed staff?

A. Licensed staff?

Q. Yes.

A. No, sir.

Q. Have you sought to hire additional personal care attendants?

A. I can do that with no problem.

Q. All right. Well, then if–if the problem is that there's too much work for the available staff, you've never sought additional licensed personnel, and you can hire additional unlicensed personnel, why haven't you done it?

A. I try. I try.

She went on to testify about the difficulty of finding and retaining good personal care attendants. When asked why she did not hire some licensed employees, such as an LPN, even on a part-time basis, Ms. Steelman answered that "it wasn't something that I thought would be allowed" by Americare. As to why she thought hiring additional licensed personnel would not be allowed, Ms. Steelman cited "the money difference" and the budget.

Paula Gann, a former employee of Celebration Way, testified that she was cleaning in the dining room when Ms. Steelman came in the front door of Celebration Way on May 29, 2004, to administer the enema to Ms. Farrar. Ms. Gann observed that Ms. Steelman "looked irritated." Ms. Steelman went into the kitchen, and Ms. Gann overheard her say that she was going to give Ms. Farrar an enema so she would have a bowel movement and shut up.[2]

_____

[2]Ms. Steelman later testified that she was frustrated because she had been to several stores looking for enema supplies and because she was concerned about her children. (She had been with her family prior
(continued...)

The plaintiffs called Dr. Deborah Robin, a specialist in geriatrics, internal medicine, and rheumatology, as an expert witness. She gave testimony concerning the standard of care applicable to an assisted living facility in Shelbyville or a similar community, and to licensed nurses working in such a facility, during the relevant time period. Dr. Robin opined that if Ms. Farrar had received Miralax every day during her stay at Celebration Way, she probably would not have become constipated. Dr. Robin read the Celebration Way records to show that Ms. Farrar received Miralax 15 times in October 2003, 13 in November, 20 in December, 21 in January 2004, six in February, none in March, five in April, and eleven in May. She testified that the most likely cause of Ms. Farrar's death was the enema administered on May 29, 2004.

When asked how many nurses an assisted living should have at any time, Dr. Robin stated that an assisted living facility is required "to have a nurse on duty but not necessarily in the facility."[3] She explained that there had to be a nurse or administrator available to make decisions as to the appropriate action to be taken if problems arose.

The video deposition of Dottie Hunt, the director of nursing at Celebration Way, was played as evidence at the trial. Ms. Hunt recalled talking with Dr. Tamula's nurse in January 2004 about changing Ms. Farrar's Miralax order to PRN. She admitted that there was no telephone order to reflect this change. Ms. Hunt further acknowledged that all of the printed medication orders for subsequent months provided that Miralax be given daily but that she had hand written "PRN" on them. She admitted breaching the standard of care with respect to Ms. Farrar in a number of ways.

Dr. Alma Tamula's video deposition was also played at the trial. She had no recollection or record of ordering Ms. Farrar's Miralax to be administered PRN.

The video deposition of Maureen Meyer, Americare's regional operations director, was played as part of the plaintiff's evidence. Ms. Meyer testified that she was responsible for supervising the Celebration Way facility, as well as a number of other facilities. She hired and trained the administrator and consulted with the administrator concerning the hiring of the director of nursing. Thus, Ms. Meyer acted as the direct supervisor of Ms. Steelman.

---

[2](...continued)
to being called back to the assisted living facility.)

[3]Regulations require an assisted living facility to have "a sufficient number of employees to meet the residents' needs" and to "have a licensed nurse available as needed." Tenn. Comp. R. & Reg. 1200-08-25-.06(1)(a)(3),(4).

A registered nurse, Ms. Meyer also did chart audits, some quality assurance work, and some training with the director of nursing.

The plaintiffs also played the video deposition of James Reiker, Americare's vice-president of finance, into evidence. He explained the corporate structure of Americare and its financial procedures.

Ms. Steelman was called back to the stand by the defendants. She testified that she and Ms. Hunt were fulltime employees of Celebration Way. In her role as adminstrator, Ms. Steelman was responsible for hiring the staff for the facility, and she explained some of the problems she had in getting the right people to do the work. Ms. Steelman stated that she "went through a phase where there was nobody that really actually wanted to take care of the elderly." Over the last five years, however, the situation had improved in that she had been able to find people interested in working and "the turnover's just been almost nothing."

Asked to describe her duties and those of Ms. Hunt, Ms. Steelman stated that both were on call twenty-four hours a day. If a problem arose and neither was at the facility, one of them would go in and take care of the issue. If there was a staffing problem, they would find someone to cover the shift or cover it themselves. Ms. Steelman admitted numerous breaches of the applicable standards of care with respect to the care given to Ms. Farrar. During questioning by the plaintiffs' attorney, Ms. Steelman offered the following clarification with regard to her deposition testimony:

Q. You told me in your deposition that you had told the people at Americare Systems there was too much work for the level of staffing. Do you remember that?

A. I do remember that, but that's not actually the way it works. It was–It was only too much work because I hadn't been able to hire the right people for the right job, they just couldn't accomplish what they needed to. It's not that we were ever understaffed. They budgeted enough staff. It's just I couldn't find the right people to take care of the residents properly.

The defense called Ms. Meyer to the stand to testify in court. She stated that there was a nurse on the premises at Celebration Way five days a week during the day. Asked about staffing during the period from October 2003 through May 2004, Ms. Meyer testified that the "positions were always there," but Ms. Steelman "had a period of time where she had a lot of turnover." She testified that Ms. Steelman always made sure that the shifts were covered, even if she or Ms. Hunt had to cover then. Under questioning by plaintiffs' counsel, Ms. Meyer also gave the following testimony:

Q. . . . You also heard [Ms. Steelman] testify there were not enough people to get the job done?

A. Yes, I heard that.

Q. She told you that.

A. We've had multiple conversations about staffing.

Q. She says–Mary Ann Steelman says that, you, Americare, knew that Celebration Way's plate was very–and I'm using the word very underscored–full.

A. I would totally agree that their plates are full.

Q. Told you, Americare, that the work was overwhelming.

A. Yes.

Q. By the way, from October 23rd until May the 29th, you've testified about all of these turnovers and these employees leaving or not working. How many employees were terminated, fired, or left Celebration Way between those months I just mentioned? I'll say it again, October 23rd to May 29th.

A. I don't have that data in front of me.

. . .

A. The terminations and the turnover. Turnover is not a good thing. We are not proud of our turnovers. However, we have to have people doing the job that's required and expected by our residents. Therefore, Mary Ann had the authority to terminate the people who were not performing their duties according to their assignments, and in making those terminations she chose to work those shifts herself.

At the conclusion of the proof, Americare moved for a directed verdict on the plaintiffs' claim for punitive damages, and the court denied the motion. The plaintiffs moved for and were granted a directed verdict "that any liability that results from the actions of Celebration Way employees is imputable and will be imputed to Americare." The court also

granted a directed verdict finding, as a matter of law, that the following acts or omissions were a breach of the applicable standard of care:

- Defendant Mary Ann Steelman's administration of an enema on May 29th, 2004 to Mable Frances Farrar when signs of a bowel obstruction were present;

- Defendant Steelman's failure to follow Dr. Tamula's orders by giving two ounces of milk and two ounces of molasses rather than six ounces of milk and six ounces of molasses in a Fleets enema on May 27th, 2004;

- Defendant Dottie Hunt's failure to notify Dr. Alma Tamula of Ms. Farrar's change in condition regarding Ms. Farrar's constipation on May 22nd, 2004, May 24th, 2004, and May 25th, 2004;

- Defendant Hunt's failure to administer Miralax at 8 o'clock a.m. every day during the month of April, 2004, in the absence of a doctor's order directing that medication to be given PRN:

- Defendant Hunt's failure to administer Miralax at 8:00 a.m. every month [sic] during the month of May, 2004, in the absence of a doctor's order directing that the medication be given PRN;

- Defendant Steelman's failure to chart the type, volume and results of enema allegedly given on May 27th, 2004;

- Defendant Hunt's failure to highlight ambiguous doctor's orders and contact Dr. Tamula for a clarification;

- A failure by Defendant Hunt to document each and every time Ms. Farrar allegedly refused Miralax;

- Failure by Defendant Hunt to administer Miralax every morning at 8 o'clock a.m. as it was ordered during the month of December 2003, in the absence of an order signed by Dr. Tamula prior to the time at which the Miralax was given;

- Failure by Defendant Hunt and/or Defendant Steelman to document telephone orders received from physicians;

- Defendant Hunt's changing Ms. Farrar's order for Miralax to PRN without documentation or a corresponding order from a physician;

- Failure by Defendant Hunt and Defendant Steelman to call Dr. Tamula's office to obtain a criteria to use when an order was allegedly changed to PRN;

- Mary Gutierrez, a Celebration Way personal attendant, taking the May 27th, 2004 order from Dr. Tamula's office without being authorized to do so;

- Defendant Hunt's administration of Fleet suppositories on May the 24th, 2004 without an accompanying order authorizing administration of over-the-counter medications;

- Defendant Hunt and/or Defendant Steelman's failure to notify Dr. Tamula when Ms. Farrar's condition changed with respect to her documented incontinence in November of 2004;

- Defendant Steelman's failure to recommend that Ms. Farrar go to the emergency room on May 29th, 2004;

- Defendant Hunt's failure to prepare a Request for Physician Service Form and to ask Dr. Tamula to address whether Miralax was intended to be made PRN;

- Defendant Hunt and/or Defendant Steelman's failure to notify Dr. Tamula sometime in advance of May 24th, 2004 that Ms. Farrar had not had a bowel movement for a week before May the 24th, 2004;

- Defendant Hunt's failure on May 25th, 2004 to assess Mr. Farrar for the purpose of determining whether she was still constipated;

- Defendant Hunt's failure to notify Dr. Tamula of Ms. Farrar's constipation on May the 26th, 2004;

- Defendant Steelman's failure to percuss Ms. Farrar's abdomen for administration of an enema on May 29th, 2004.

*Verdict and judgment*

The jury deliberated and entered a verdict in favor of the plaintiffs. As to Americare, the jury found that Americare was at fault "in failing to provide sufficient personnel at Celebration Way . . . at or around the time of the death of Mable Frances Farrar." The jury attributed fault as follows:

Defendant Dottie Hunt                                                                                     20%
Defendant Mary Ann Steelman                                                                    30%
Employees of Celebration Way other than
      Defendants Dottie Hunt and Mary Ann Steelman              0%
Defendant Americare Systems, Inc. (only to the
degree that you find fault based on a failure to
provide sufficient personnel at Celebration Way)                                 50%

The total amount of compensatory damages awarded was $300,000.

The jury also determined that the plaintiffs had proven that the defendants acted "either intentionally, recklessly, maliciously, or fraudulently." Therefore, a separate hearing was held on the issue of punitive damages. The jury assessed $10,000.00 in punitive damages against Ms. Steelman, $5,000.00 against Ms. Hunt, and $5,000,000.00 against Americare. The trial court entered judgment on the jury verdict and upheld the award of punitive damages. The trial court denied Americare's post-trial motions–a motion for judgment in accordance with directed verdict and/or motion for judgment notwithstanding the verdict, and a motion to alter or amend, for remittitur, and/or for a new trial.

*Issues on appeal*

On appeal, Americare disputes the judgment of direct liability against it as well as the award of punitive damages. Americare presents the following issues:

1. Whether the judgment against Americare should be reversed because the plaintiffs failed to present expert testimony or other evidence to establish the applicable standard of care regarding appropriate staffing levels for an assisted living facility.

2. Whether the judgment against Americare should be reversed because the plaintiffs failed to present expert testimony or other evidence that Americare deviated from the applicable standard of care.

3. Whether the judgment against Americare should be reversed because the plaintiffs failed to meet their burden of proving that any purported negligence/recklessness on the part of Americare caused or contributed to their mother's death.

4. Whether this court should set aside or reduce the amount of punitive damages assessed against Americare.

ANALYSIS

We begin with the third issue, regarding proof of causation, because we find that issue determinative. With respect to the jury verdict, our review is limited to "a determination of whether there is any material evidence in the record to support the jury's verdict."[4] *Newcomb v. Kohler Co.*, 222 S.W.3d 368, 401 (Tenn. Ct. App. 2006); *see* Tenn. R. App. P. 13(d).

In a claim for negligence, one of the required elements is an injury to the plaintiff proximately caused by the defendant's breach of a duty. *Lindsey v. Miami Dev. Corp.*, 689 S.W.2d 856, 858 (Tenn. 1985). Whether a claim of inadequate staffing constitutes medical malpractice or ordinary negligence, a plaintiff is required to prove that the defendant's acts or omissions proximately caused the plaintiff's injuries. *See* Tenn. Code Ann. § 29-26-115(a). Our Supreme Court has adopted the following principles with regard to proximate cause:

> The plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is *more likely than not* that the conduct of the defendant was the cause in fact of the result. *A mere possibility of such causation is not enough*; and when the matter remains one of pure speculation or conjecture or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant . . . . The plaintiff is not, however, required to prove the case beyond a reasonable doubt. The plaintiff need not negative entirely the possibility that the defendant's conduct was not a cause and it is enough to introduce evidence from which reasonable persons may conclude that it is more probable that the event was caused by the defendant than that it was not . . . .

---

[4]This standard does not apply when there is evidence that the trial judge failed to fulfill his duty as thirteenth juror in denying a motion for new trial, but we find no such evidence in this case in light of the trial court's order regarding its fulfillment of that role. *See Washington v. 822 Corp.*, 43 S.W.3d 491, 494 (Tenn. Ct. App. 2000).

*Lindsey*, 689 S.W.2d at 861-62 (quoting Prosser & Keaton, TORTS § 41 (5th ed. 1984) (emphasis added)); *see also Miller v. Choo Choo Partners, L.P.*, 73 S.W.3d 897, 901 (Tenn. Ct. App. 2001).

When analyzing whether it is more probable than not that the defendant's actions caused the plaintiff's injuries, the jury is allowed to make reasonable inferences from circumstantial evidence, and such inferred facts may form the basis of further inferences of the ultimate fact at issue. *Benson v. H.G. Hill Stores, Inc.*, 699 S.W.2d 560, 563 (Tenn. Ct. App. 1985). However, "[a]n inference is reasonable and legitimate only when the evidence makes the existence of the fact to be inferred more probable than the nonexistence of the fact." *Underwood v. HCA Health Servs. of Tenn., Inc.*, 892 S.W.2d 423, 426 (Tenn. Ct. App. 1994). A jury is "not permitted to engage in conjecture, speculation, or guesswork as to which of two equally probable inferences is applicable." *Martin v. Washmaster Auto Ctr., U.S.A.*, 946 S.W.2d 314, 317 (Tenn. Ct. App. 1996).

The plaintiffs argue that Americare's failure to provide adequate staffing led to Ms. Farrar's death. Even if we assume that the plaintiffs proved that there was inadequate staffing at Celebration Way, this court cannot find any material evidence making it more probable than not that such understaffing caused Ms. Farrar's death. The plaintiffs emphasize the trial court's directed verdict finding multiple deviations from the standard of care by the two nurses, Ms. Steelman and Ms. Hunt. The plaintiffs further cite the testimony of Ms. Steelman concerning staffing at Celebration Way, and the testimony of Dr. Robin in which she opined that Ms. Farrar likely would not have become constipated if she had received the appropriate doses of Miralax and that her constipation resulted in the administration of the enema, which caused the perforation of her bowel. The plaintiffs do not identify any evidence that connects understaffing with the deviations from the standard of care found by the trial court.

In their appellate brief, the plaintiffs rely on the following series of inferences:

(1) That chronic understaffing led to Ms. Farrar not receiving the needed Miralax;

(2) That Ms. Farrar became severely constipated as a result of not receiving Miralax;

(3) That her constipation led to her bowel obstruction;

(4) That Ms. Steelman's "frustration and fatigue" as a result of understaffing "caused her to recklessly give an enema she knew she should not give";

(5) That the enema, "as a result of chronic understaffing," caused Mr. Farrar's death.

-14-

While there is evidence in the record to support statements #2 and #3, there is no material evidence to support a conclusion that understaffing caused the nurses' failure to administer Miralax properly, or that understaffing caused Ms. Steelman's frustration and fatigue which then led her to recklessly administer the enema in question. Based upon the available evidence, it is just as likely that Ms. Steelman and Ms. Hunt were careless, incompetent, or poorly performing employees who simply did not perform their duties conscientiously and/or made bad decisions. The facility had a nurse on call at all times, and there is no evidence showing that the hiring of another nurse or other staff would have affected the performance of Ms. Steelman or Ms. Hunt. There is no evidence that their decisions or actions were caused by a lack of staffing.

We must disagree with the trial court's acceptance of the jury verdict in this case because there is no material evidence to support the conclusion that it was more probable than not that Ms. Farrar's death was caused by staffing decisions made by Americare. Given the absence of evidence of any kind concerning the causation element, we need not decide whether this case required expert testimony.

In light of our conclusion concerning the case for direct liability against Americare, the remaining issues are pretermitted.

CONCLUSION

We reverse the decision of the trial court with respect to the direct liability of Americare. This necessarily results in the setting aside of all damages, including punitive damages, related to Americare's direct liability. Costs of this appeal are assessed against the plaintiffs.

_____
ANDY D. BENNETT, JUDGE