# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### January 24, 2013 Session

## HILL BOREN, P.C. v. PATY, RYMER and ULIN, P.C. and JAMES ERIC HAMM

Direct Appeal from the Chancery Court for Madison County
No. 67226      Walter C. Kurtz, Sr. Judge, By Designation

No. W2012-00925-COA-R3-CV - Filed March 19, 2013

This appeal involves a dispute over an attorney's fee involving two law firms and their client. The parties originally entered into a contract whereby both law firms would jointly represent the client as a plaintiff in a personal injury suit. Two years later, the client discharged one of the law firms. The other firm continued to represent the client, and when the case settled over a year later, the remaining firm retained the entire contingency fee. The discharged firm sued the client and the other firm, alleging that it was entitled to a share of the contingency fee and asserting numerous causes of action. The defendants claimed that the discharged firm was limited to quantum meruit. The trial court granted summary judgment to the defendants on all claims. The plaintiff law firm appeals. We affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed**

ALAN E. HIGHERS, P. J., W.S., delivered the opinion of the Court, in which HOLLY M. KIRBY, J., and J. STEVEN STAFFORD, J., joined.

R. Sadler Bailey, Memphis, Tennessee, for the appellant, Hill Boren, P.C.

Selma Cash Paty, Chattanooga, Tennessee, for the appellee, Paty, Rymer & Ulin, P.C.

John W. Chandler, Jr., Chattanooga, TN, for the appellee, James Eric Hamm

## OPINION

### I. FACTS & PROCEDURAL HISTORY

James Eric Hamm ("Mr. Hamm") suffered an injury while working for his employer, a railroad, on November 8, 2005. Mr. Hamm was twenty-nine years old at the time. As a result of the accident, Mr. Hamm underwent surgery to have a plate and screws placed in his neck and a disc replaced with donor material.

Because Mr. Hamm was employed by a railroad, he was required to seek recovery from his employer pursuant to the Federal Employers' Liability Act, 45 U.S.C.A. § 51, rather than Tennessee's workers' compensation law. On February 24, 2006, Mr. Hamm contacted the Hill Boren law firm, in Jackson, Tennessee, about his potential claim because he saw their advertisement in the telephone book representing that they were experienced in handling railroad worker accident cases and specialized in "FELA railroad" cases. Hill Boren actually had very little experience with railroad law and FELA cases. Mr. Hamm's case was assigned to Hill Boren attorney James Krenis, who had no experience with FELA law or railroad accidents. On or about March 8, 2006, Mr. Hamm received a letter from Attorney Krenis welcoming him as a client of the law firm, advising him that he was being represented by the Hill Boren firm as a whole, and informing him that they had begun the initial investigation of his case and would try to keep him up to date on all developments in his case.

In April 2006, Attorney Krenis contacted Attorney Pamela O'Dwyer, of the Paty, Rymer, & Ulin law firm in Chattanooga, Tennessee because Attorney O'Dwyer had extensive experience with FELA claims and railroad litigation. Attorney Krenis proposed that they jointly represent Mr. Hamm for some sort of a "fee split" arrangement. On April 20, 2006, Mr. Hamm, Attorney Krenis, and Attorney O'Dwyer met in person at the Hill Boren office in Jackson. Before Mr. Hamm was introduced to Attorney O'Dwyer, he was asked by Attorney Krenis to sign a contract with Hill Boren detailing the terms of its representation of Mr. Hamm. The contract provided that Hill Boren would receive a contingency fee of forty percent of any recovery obtained. The contract was signed and back-dated to February 24, 2006, when Attorney Krenis began working on Mr. Hamm's case. After signing the contract, Mr. Hamm was introduced to Attorney O'Dwyer. Attorney Krenis explained to Mr. Hamm that Attorney O'Dwyer was "one of the best railroad attorneys around" and that she was being brought "on board" to help with the case. Mr. Hamm then signed a second contract, with Hill Boren *and* Paty, Rymer, & Ulin, and all parties understood that Mr. Hamm would be jointly represented by the two law firms. This second contract also provided for a forty percent contingency fee to be paid from any recovery, but it stated that Hill Boren would receive twenty-five percent of the contingency fee and that Paty, Rymer, & Ulin would receive the remaining seventy-five percent of the fee.

In the months after the April meeting at Hill Boren, Mr. Hamm called Attorney Krenis roughly one to two times per month. Sometimes these calls were concerning various problems that Mr. Hamm encountered with his medical treatment or medical bills, and sometimes he called simply for an update on the progress of his case. Most of the time, Mr. Hamm spoke with Attorney Krenis's assistant. She would update him on any new information she had or tell him that she would check with Attorney Krenis. Regardless of what Mr. Hamm was told, at the end of every conversation with the assistant, Mr. Hamm would say something like, "just have him call me." According to Mr. Hamm, Attorney Krenis "sometimes" returned his calls, "but not very often."

During the latter part of 2006, Mr. Hamm began calling Attorney O'Dwyer in addition to calling Attorney Krenis. Attorney O'Dwyer routinely spoke with Mr. Hamm and returned his telephone calls, and she also sent him updates about the case and "copied" him on emails and various documents. However, Mr. Hamm continued to call Hill Boren approximately once a month.

Two years into the representation, on July 15, 2008, Mr. Hamm sent the following letter to Attorney Krenis:

> Dear Sir:
>       I hope this letter finds you doing well. As you are surely aware we have not communicated in over a year personally. The entirety of my case has been overseen primarily by Mrs. O'Dwyer. Her efforts to help me in my case have been exemplary.
>       Mrs. O'Dwyer has repeatedly tried to discourage me from communicating to you my disappointment with your lack of interest in my representation. I do however enjoy the stimulating newsletter that I do receive from time to time.[1] Therefore, since I have seen little to no interest in my case from anyone at Hill-Boren, I am respectfully asking that you withdraw yourself from my case. Please respond to me upon receipt of this letter as to w[he]ther or not there is a problem with my request.

Shortly after receiving the letter, on or about July 18, 2008, Attorney Krenis called Mr. Hamm and asked him to reconsider his decision. Mr. Hamm expressed his dissatisfaction with "not knowing what was going on" with the case and complained about the fact that Attorney Krenis would not return his phone calls. Attorney Krenis assured Mr. Hamm that the communication problem would be resolved and that he would respond to Mr. Hamm's

---

[1] At his deposition, Mr. Hamm explained that his comment about the firm newsletter was written with "a little bit of sarcasm." He said, "I wanted to speak with Mr. Krenis. I didn't want a newsletter."

calls in the future. Mr. Hamm then agreed to allow the representation to continue. During this same conversation, Mr. Hamm asked Attorney Krenis about his potential disability claim, and Attorney Krenis told him that there was someone on staff at the Hill Boren firm who could help him. Attorney Krenis then "put [Mr. Hamm] in touch with" the firm's attorney who handled disability claims.

Approximately two months later, on September 10, 2008, Mr. Hamm sent a second letter to Attorney Krenis, which stated:

Dear Sir:

I hope that you are well. We spoke on the phone on July 18th discussing my disability case and you recommended a Mr. Mike Hartup who is on staff at this firm. Upon speaking with Mr. Hartup that same day, he assured me that he would take the weekend to review my case and he would speak with me on the 21st. I left several messages that day and never received any response. On August 2nd, I received a CERTIFIED letter stating he could not help me with my matters. This is fine but, a simple phone call would have sufficed.

I am very dissatisfied with the lack of attention that I have received and have come to the decision that I will feel better served if you would honor my previous request and dismiss yourself from my case.

Within days of receiving this letter, Attorney Krenis responded with the following letter to Mr. Hamm:

I am in receipt of your letter dated September 10, 2008. Nothing has changed since we last spoke. At that time, I expressed my apologies for your experience with Mr. Hartup. You certainly have the right to request that I not represent you any longer on this case. If you do that, I will place an attorney's lien for the time and expense that my office has spent representing you. This will include ordering medical records, maintaining and updating our file, communicating with co-counsel, communicating with you when necessary, communicating with the Department of Labor, responding to e-mail, etc. At that point you will be free to simply remain with Ms. O'Dwyer (who is a highly accomplished attorney in the field of railroad law), hire additional counsel, or terminate all counsel. If you terminate my services, I strongly urge you to establish a separate contract with Ms. O'Dwyer, as I believe her association with this case currently is only through my contract with you. I am disappointed in your sudden change of heart for no apparent reason, and certainly hope you will reconsider again and remain with me and the law firm

-4-

of Hill Boren. I think it is unfair to allow your dissatisfaction with another attorney in the Social Security Department of this firm to give you reason to terminate my services. I made it clear when we last spoke that any time you needed to speak with me, you could call me directly. I don't know what you feel you are not getting from me or my firm, but I question whether you will find it any where else. I look forward to hearing from you, whatever you decide.

Mr. Hamm did not respond to the letter from Attorney Krenis. Nevertheless, it was understood and agreed by Attorney Krenis, on behalf of Hill Boren, that as of the receipt of Mr. Hamm's second letter, Mr. Hamm had terminated Mr. Krenis and the Hill Boren firm from representing him. An order of withdrawal was never entered in Mr. Hamm's case. However, after September 18, 2008, neither Attorney Krenis nor any other lawyer or employee of Hill Boren did any substantive work on the case, other than receiving copies of letters or pleadings from Attorney O'Dwyer and other employees of her firm, and providing limited information and documentation to Attorney O'Dwyer and others at her firm.

Attorney O'Dwyer continued to represent Mr. Hamm after Hill Boren's termination, but she and Mr. Hamm did not execute another written contract. On November 27, 2009, more than one year after Attorney Krenis was terminated by Mr. Hamm, Attorney O'Dwyer contacted Attorney Krenis via email and advised him that a mediation had been scheduled in Mr. Hamm's case and that she needed to reach an agreement with Attorney Krenis and the Hill Boren law firm as to its fee so that she would know the ramifications of Hill Boren's fee during the settlement negotiations of Mr. Hamm's case. The first contract that had been executed, by only Mr. Hamm and Hill Boren, provided, in relevant part:

> In the event the services of the Firm are terminated for any reason by Client(s) prior to settlement or a final adjudication of their claim, the Firm shall be entitled to a reasonable fee for the services rendered to the Client as well as expenses paid on the case from any recovery subsequently obtained by the Client(s).

The second contract, signed by Mr. Hamm, Hill Boren, and Paty, Rymer & Ulin, provided, in relevant part:

> In the event the case is settled without the advice of the ATTORNEYS, should CLIENTS seek alternative representation, or should the ATTORNEYS' contingency fee not be paid for any reason, ATTORNEYS shall have a right to *quantum meruit* recovery based on ATTORNEYS' hourly rate applicable at the time of the settlement or other disposition. This equitable relief is to

avoid unjust enrichment of the CLIENTS should CLIENTS determine that the services of the ATTORNEYS are no longer beneficial.[2]

Attorney Krenis responded to Attorney O'Dwyer's email inquiry with an email stating that he and Ricky Boren (a senior partner at the firm) had briefly reviewed Mr. Hamm's file and found the following:

> There was a 25% referral fee agreed upon, based upon a 40% contingency with the client. We have over $700 in expenses, and spent at least 20 hours speaking to him (mostly years ago, despite his contentions), ordering records, setting up the file, doing legal research early on, and communicating with you/your office. The expenses and a partial log of time management is being faxed.

The expense ledger and time records were sent to Attorney O'Dwyer later that day.

The first mediation held in Mr. Hamm's case was unsuccessful. On June 3, 2010, Mr. Hamm attended a second mediation with Attorney O'Dwyer. Either prior to or during the mediation, Attorney O'Dwyer agreed to reduce her contingency fee from forty percent to thirty-three percent in order to obtain Mr. Hamm's agreement to settle the case. The case ultimately settled for seven figures. Attorney O'Dwyer's contingency fee was calculated at over $480,000.

Approximately one week after the mediation, on June 11, 2010, Attorney O'Dwyer sent a letter to Attorney Krenis which stated:

> In accordance with our conversation I am confirming the result of the contract with [Mr. Hamm].
> . . .
> I am attaching a copy of your billing statement dated November 30, 2009. Although [Mr. Hamm] states he terminated his services from you on September 10, 2008, your billing statement may set out twenty hours of work expended by your firm. Though [Mr. Hamm] disputes the billing, he will agree to pay you according to the contract. . . .
> I have calculated the 20 hours at $250 per hour and added the expenses

---

[2] The contract stated that the term "ATTORNEYS" referred to Paty, Rymer & Ulin and that the term "CLIENTS" referred to Mr. Hamm and Hill Boren. However, all parties agree that "Hill-Boren was inadvertently and mistakenly listed as a client of Paty, Rymer & Ulin, P.C. in the PR&U contract" and "both Hill-Boren and Paty, Rymer & Ulin were Mr. Hamm's attorneys under that contract."

$719.10 and will send $5,719.10 to satisfy your fees and expenses as soon as we are in a position to fulfill his obligation.

Attorney O'Dwyer did not inform Attorney Krenis about the settlement, because, according to Attorney O'Dwyer, she believed that doing so would violate a confidentiality agreement signed by her client. Attorney Krenis responded to the aforementioned letter by stating in an email: "Please send the $5700 or so you referenced in your letter and we will be 'square.'" The following month, Attorney O'Dwyer sent Attorney Krenis a letter enclosing a check made payable to him and Hill Boren in the amount of $5,719.10 "as per our agreement and with the permission of Eric Hamm." The check was not returned but it was not negotiated either. At some point, Attorney Krenis learned from defense counsel in Mr. Hamm's case that the case had settled for seven figures, and Hill Boren then refused to accept the sum of $5,719.10 for its fee in the case.

Hill Boren filed this lawsuit against Paty, Rymer & Ulin on September 3, 2010. The complaint acknowledged that Hill Boren was discharged by Mr. Hamm in September 2008, but it alleged that the contractual agreement between the law firms of Hill Boren and Paty, Rymer & Ulin remained in effect so that Hill Boren was nevertheless entitled to one-fourth of the contingency fee upon settlement of the case. The complaint also alleged that, on or about June 28, 2010 (the date when Attorney Krenis said we will be "square"), Attorney O'Dwyer told Attorney Krenis that Mr. Hamm's case was "not a big case" and that there was not a lot of money involved in the settlement negotiations. Hill Boren's complaint alleged that "this misrepresentation of the value of the case by co-counsel" had fraudulently induced Attorney Krenis to agree to accept a compromised sum less than he would have received under the contract. Hill Boren later amended its complaint to formally allege breach of contract, fraudulent inducement and/or fraudulent misrepresentation, negligent misrepresentation, intentional interference with a business relationship, and procurement of breach of contract, and the amended complaint also added a claim for punitive damages.[3] Hill Boren later filed a second amended complaint adding as a defendant the client, Mr. Hamm, and asserting a cause of action against him for breach of contract. The complaint alleged that Mr. Hamm's termination of Hill Boren was without cause. Where the previous complaint had alleged that the parties' contract was never terminated, the amended complaint asserted that "[i]t is unclear whether The Contract between [Hill Boren], Hamm, and PR&U was ever officially terminated[.]"

---

[3] An additional claim for violation of the Tennessee Consumer Protection Act was asserted in the complaint, but it was dismissed by the trial court, and that ruling is not challenged on appeal. We also note that Paty, Rymer, & Ulin filed a countercomplaint against Hill Boren regarding a dispute over a contract with another client, but that claim was severed from this matter and assigned a separate docket number, and that ruling is not at issue on appeal either.

Paty, Rymer & Ulin and Mr. Hamm filed separate motions for summary judgment. Each motion was supported by statements of undisputed facts and numerous exhibits including contracts, emails, letters, and testimony from several depositions. Hill Boren filed separate responses to the motions along with its own statement of undisputed facts and numerous exhibits. After the motions were argued before the court, the trial court entered an order granting summary judgment to Paty, Rymer & Ulin and to Mr. Hamm on all issues. Hill Boren timely filed a notice of appeal.

## II.   ISSUES PRESENTED

On appeal, Hill Boren frames the issue as: "Whether the trial court erred in granting summary judgment to the Defendants, thereby denying Plaintiff its contracted upon fee." Hill Boren presents numerous arguments in support of its assertion that summary judgment was improper as to the various claims asserted in its complaint. The defendants, Mr. Hamm and Paty, Rymer & Ulin, argue, naturally, that summary judgment was properly entered in their favor. For the following reasons, we affirm the decision of the chancery court.

## III.   STANDARD OF REVIEW

A motion for summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." **Tenn. R. Civ. P. 56.04.** "A disputed fact presents a genuine issue if 'a reasonable jury could legitimately resolve that fact in favor of one side or the other.'" **Martin v. Norfolk S. Ry.**, 271 S.W.3d 76, 84 (Tenn. 2008) (quoting *Byrd v. Hall*, 847 S.W.2d 208, 215 (Tenn. 1993)). In other words, "[i]f reasonable minds could justifiably reach different conclusions based on the evidence at hand, then a genuine question of fact exists." **Green v. Green**, 293 S.W.3d 493, 514 (Tenn. 2009) (citing *Martin*, 271 S.W.3d at 84; *Louis Dreyfus Corp. v. Austin Co.*, 868 S.W.2d 649, 656 (Tenn. Ct. App. 1993)). "If, on the other hand, the evidence and the inferences reasonably drawn from the evidence would permit a reasonable person to reach only one conclusion, then no material factual dispute exists, and the question can be disposed of as a matter of law." **Id.** (citing *Godfrey v. Ruiz*, 90 S.W.3d 692, 695 (Tenn. 2002); *Seavers v. Methodist Med. Ctr. of Oak Ridge*, 9 S.W.3d 86, 91 (Tenn. 1999)).

"The party seeking the summary judgment has the burden of demonstrating that no genuine disputes of material fact exist and that it is entitled to a judgment as a matter of law." **Green**, 293 S.W.3d at 513 (citing *Martin*, 271 S.W.3d at 83; *Amos v. Metro. Gov't of Nashville & Davidson County*, 259 S.W.3d 705, 710 (Tenn. 2008)). "The moving party may make the required showing and therefore shift the burden of production to the nonmoving

party by either: (1) affirmatively negating an essential element of the nonmoving party's claim; or (2) showing that the nonmoving party cannot prove an essential element of the claim at trial." *Martin*, 271 S.W.3d at 83 (citing *Hannan v. Alltel Publ'g Co.*, 270 S.W.3d 1, 5 (Tenn. 2008)).[4]  In order to negate an essential element of the claim, "the moving party must point to evidence that tends to disprove an essential factual claim made by the nonmoving party." *Id.* at 84 (citing *Blair v. W. Town Mall*, 130 S.W.3d 761, 768 (Tenn. 2004)).  "If the moving party is unable to make the required showing, then its motion for summary judgment will fail." *Id.* (citing *Byrd*, 847 S.W.2d at 215).

If the moving party does make a properly supported motion, the nonmoving party is required to produce evidence of specific facts establishing that genuine issues of material fact exist. *Martin*, 271 S.W.3d at 84 (citing *McCarley v. W. Quality Food Serv.*, 960 S.W.2d 585, 588 (Tenn. 1998); *Byrd*, 847 S.W.2d at 215).  "The nonmoving party may satisfy its burden of production by: (1) pointing to evidence establishing material factual disputes that were over-looked or ignored by the moving party; (2) rehabilitating the evidence attacked by the moving party; (3) producing additional evidence establishing the existence of a genuine issue for trial; or (4) submitting an affidavit explaining the necessity for further discovery pursuant to Tenn. R. Civ. P., Rule 56.06." *Id.* (citing *McCarley*, 960 S.W.2d at 588; *Byrd*, 847 S.W.2d at 215 n.6).  "The nonmoving party's evidence must be accepted as true, and any doubts concerning the existence of a genuine issue of material fact shall be resolved in favor of the nonmoving party." *Id.* (citing *McCarley*, 960 S.W.2d at 588).

The resolution of a motion for summary judgment is a matter of law, which we review de novo with no presumption of correctness. *Id.*  However, "we are required to review the evidence in the light most favorable to the nonmoving party and to draw all reasonable inferences favoring the nonmoving party." *Id.* (citing *Staples v. CBL Assocs., Inc.*, 15 S.W.3d 83, 89 (Tenn. 2000)).

## IV.   DISCUSSION

### A.   Breach of Contract

We begin by considering the breach of contract claim asserted against both Mr. Hamm and Paty, Rymer & Ulin.  "'The essential elements of any breach of contract claim include (1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of the contract.'" *ARC LifeMed, Inc. v.*

---

[4]  As noted by the trial court, the summary judgment standard set forth in *Hannan* is applicable to this case because it was filed prior to July 1, 2011. *See* Tenn. Code Ann. § 20-16-101; *Sykes v. Chattanooga Housing Authority*, 343 S.W.3d 18, 25 n.2 (Tenn. 2011).

***AMC-Tennessee, Inc.***, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005) (quoting *Custom Built Homes v. G.S. Hinsen Co., Inc.*, 1998 WL 960287 (Tenn. Ct. App. Feb. 2, 1998)). In its complaint, Hill Boren alleged that Mr. Hamm terminated Hill Boren without cause and breached the parties' contract by failing to pay Hill Boren one-fourth of the contingency fee. With regard to Paty, Rymer, & Ulin, the complaint alleged a breach of contract based upon its failure to divide the contingency fee with Hill Boren in accordance with the contract's terms. To analyze these issues, we will begin by considering the effect of Mr. Hamm's termination of Hill Boren in September 2008.

"Under Tennessee law a client has a right to discharge his attorney with or without cause." ***Crawford v. Logan***, 656 S.W.2d 360, 364 (Tenn. 1983) (citing *Chambliss, Bahner & Crawford v. Luther*, 531 S.W.2d 108 (Tenn. Ct. App. 1975)). "Clients cannot be forced to entrust their legal matters to an unwanted lawyer." ***Seibers v. Pepsi-Cola Bottling Co.***, No. M1999-02559-COA-R3-CV, 2000 WL 1862833, at *3 (Tenn. Ct. App. Dec. 21, 2000). Accordingly, clients can "discharge a lawyer at any time regardless of cause and regardless of any contract between the client and the lawyer." ***Id.*** (citing *Yoakley v. Hawley*, 73 Tenn. 670, 673 (1880); *In re Ellis*, 822 S.W.2d 602, 607 (Tenn. Ct. App. 1991); *Chambliss, Bahner & Crawford*, 531 S.W.2d at 110). However, upon discharge, "the attorney is entitled to just and adequate compensation for services rendered." ***Adams v. Mellen***, 618 S.W.2d 485, 488 (Tenn. Ct. App. 1981) (citing *Spofford v. Rose*, 145 Tenn. 583, 611, 237 S.W. 68, 76 (1922)). "Where there is a contract between attorney and client for compensation on either a contingency or flat-fee basis, and the attorney is discharged prior to the resolution of the case, the attorney is entitled to sue for either the full amount contemplated by the contract, or quantum meruit, an amount measured by the value of the work the attorney actually performed." ***Sowell v. Christy***, No. M2004-02186-COA-R3-CV, 2006 WL 568238, at *2 (Tenn. Ct. App. Mar. 8, 2006) (citing *Brownlow v. Payne*, 2 Tenn. App. 154, 162 (1925)). "Whether or not the client had just cause to discharge his or her attorney directly impacts the potential compensation the discharged attorney may be entitled to receive for services performed." ***Gupton v. Davis***, No. E2011-02215-COA-R3-CV, 2012 WL 4358184, at *8 (Tenn. Ct. App. Sept. 25, 2012). If the attorney was discharged *for* cause, "the attorney is entitled to recover on the basis of quantum meruit or breach of contract, whichever is *less*." ***Crawford***, 656 S.W.2d at 364 (emphasis added). On the other hand, if the attorney was discharged *without* cause, "the attorney can recover on the same basis, but is entitled to the *greater* of the two possible awards." ***Id.*** (citing *Adams*, 618 S.W.2d at 485) (emphasis added). "'Where an attorney has been discharged by his client without cause, the attorney may rescind the contract of employment and may recover on a quantum meruit for services rendered up to the date of his discharge; or he may treat the contract as continuing, although broken by the client, and may recover for the breach.'" ***Rose v. Welch***, 115 S.W.3d 478, 486 (Tenn. Ct. App. 2003) (quoting *Adams*, 618 S.W.2d at 485). "An attorney discharged without cause can thus elect to recover based on the full contract price or on quantum meruit,

whichever is greater." ***Id.*** If Hill Boren was discharged without cause, then, it can recover on the basis of breach of contract and it will be entitled to the full contract price, i.e., one-fourth of the contingency fee. If, however, Hill Boren was terminated for cause, it will be limited in this case to quantum meruit.

"A 'for cause' firing 'includes the client's right to discharge the attorney whenever the client ceases to have absolute confidence in the relationship.'" ***Gupton***, 2012 WL 4358184, at \*8 (citing *Chambliss, Bahner, & Crawford*, 531 S.W.2d at 108; *McGee v. Maynard*, No. 01A01-9810-CV-00539, 1999 WL 824298 at \*2 (Tenn. Ct. App. Aug. 12, 1999)). "The relation between attorney and client is such that the client is justified in seeking to dissolve that relation whenever he ceases to have absolute confidence in either the integrity, the judgment, or the capacity of the attorney." ***Sowell***, 2006 WL 568238, at \*2 (citing *Chambliss, Bahner & Crawford*, 531 S.W.2d at 110). In order to prove that a discharge was for cause on this basis, "a client must first establish that the discharge was the result of his actual loss of confidence in his attorney." ***Rose***, 115 S.W.3d at 486. In addition to proving this subjective prong – that the client actually did lose confidence in his attorney – the client must also prove "that his reasons for the loss of confidence leading to the attorney's discharge were objectively reasonable."[5] ***Id.*** at 487. Still, a client is not required to utilize expert proof in order to establish that he lost confidence in his or her attorney and discharged him for that reason. ***Id.***

In support of their motions for summary judgment, the defendants submitted statements of undisputed facts, lengthy testimony from several depositions, and numerous exhibits including letters, emails, and the parties' contracts.[6] Among other things, the defendants relied upon the following admission by Hill Boren:

> It was understood and agreed by James Krenis on behalf of Hill-Boren that, as of Mr. Krenis' receipt of Mr. Hamm's September 10, 2008, letter, Eric Hamm had terminated Mr. Krenis and the Hill-Boren firm from representing him.

---

[5] The ***Rose*** Court explained that, were it not for the additional objective prong, "any client would be able to defeat a contractually agreed fee arrangement so long as the attorney is discharged for a client's loss of confidence for any reason, no matter how objectively irrational or unreasonable the stated reason for the loss of confidence may be. Such a result would, for all practical purposes, make every discharge of an attorney 'for cause.'" 115 S.W.3d at 486.

[6] The record before us does not contain the memorandum of law submitted by each party in support of its respective motion for summary judgment, and we do not have a transcript of the summary judgment hearing. However, we can surmise the defendants' basic positions from the material submitted in support of the motions for summary judgment, Hill Boren's responses to the motions, other pleadings filed during that timeframe, the trial court's order on the motion for summary judgment, and the parties' briefs on appeal.

Hill Boren also admitted that, after September 18, 2008, "neither James Krenis nor any other lawyer or employee of Hill-Boren did any substantive work on Mr. Hamm's case, other than receive copies of letters or pleadings from Ms. O'Dwyer and other employees of P.R.&U and provided limited information and documentation to Ms. O'Dwyer and others at the P.R.&U. firm." The case settled during mediation in June 2010.

Relevant to the allegation that Mr. Hamm terminated Hill Boren without cause, the defendants cited, among other things, the deposition testimony of Mr. Hamm. It was not disputed that, in the months following the parties' initial meeting, Mr. Hamm called Attorney Krenis roughly one to two times per month, sometimes three times.[7] These calls were sometimes due to various problems that Mr. Hamm encountered with his medical treatment or medical bills, but other times he called simply for an update on the progress of his case. Mr. Hamm said that "ninety-nine percent of the time" he spoke with Attorney Krenis's assistant. She would either update him on any new information she had or tell him that she would check with Attorney Krenis. Mr. Hamm would always ask that Attorney Krenis return his call. Mr. Hamm explained that he expected Attorney Krenis to return his calls because "he was my attorney." According to Mr. Hamm, Attorney Krenis "sometimes" returned his calls, "but not very often." He estimated that Attorney Krenis returned only one out of every ten telephone calls he made. Mr. Hamm said, "That's why I would call back and speak with [the assistant] again."

Mr. Hamm described some specific examples of his unsuccessful attempts to contact Attorney Krenis with regard to problems he encountered. Mr. Hamm said that in 2006, he was forced to stop seeing his neurologist because his employer stopped paying his medical bills. In addition, he could no longer get his prescription medications filled because his employer ceased paying his pharmacy bills. Mr. Hamm, being unemployed at the time, could not afford to pay the bills himself. Mr. Hamm testified that he contacted Hill Boren about this issue, and he was told that they would make an effort to get the matter resolved. However, Mr. Hamm said, Hill Boren "never sent me anything saying, we're doing this, we're trying to talk to this person, we're seeing what we can do with this. I was never told

---

[7] The trial court noted in its order:

> [I]n considering a summary judgment, the trial judge places great reliance on the statement of facts. Tenn. R. Civ. Pro. 56.03. The Court need not search the record but may rely exclusively on the statement of facts. *Holland v. City of Memphis*, 125 S. W.3d 425, 428-29 (Tenn. Ct. App. 2003) and *Owens v. Bristol Motor Speedway*, 11 S.W.3d 771, 774-775 (Tenn. Ct. App. 2001).

On appeal, we have likewise relied on the numerous statements of facts and the lengthy exhibits submitted by the parties, both in support of the motions for summary judgment and in response thereto.

anything." Mr. Hamm stated, "To my knowledge, they didn't do anything." The matter was never resolved and the bills were not paid. Mr. Hamm said he knew there was no guarantee that Hill Boren would be able to get his employer to pay the bills, "but," he said, "I didn't know if anything was being done or not. I was never given an answer as far as what they were doing." Mr. Hamm stated that he called Hill Boren for advice on one particular occasion when he received a $4300 pharmacy bill, and although he spoke with the assistant and she told him she would contact Attorney Krenis, he never heard back from anyone.

Mr. Hamm described another occasion when he called Hill Boren from a physician's office because he could not be seen for his appointment unless he first signed a document agreeing to be financially responsible for the services. When Mr. Hamm attempted to reach Attorney Krenis for advice on the matter, his assistant told Mr. Hamm that she would try to contact Attorney Krenis in order to find out what to do. After waiting for some time with no response from Hill Boren, Mr. Hamm called Attorney O'Dwyer and received an immediate answer from her.

Mr. Hamm testified that this type of situation "happened on a regular basis," meaning, he would regularly need advice regarding various issues that arose with his treatment or medications, and whenever he attempted to contact Attorney Krenis, his assistant would say that she would give him a message, but Mr. Hamm's calls were never returned.

The defendants submitted this and other evidence in support of their motions for summary judgment as to Hill Boren's claims for breach of contract based on nonpayment of the contingency fee. In doing so, we find that the defendants affirmatively negated an essential element of Hill Boren's breach of contract claims. The defendants clearly established that Hill Boren was terminated by Mr. Hamm in September 2008, and therefore, Hill Boren was no longer entitled to enforce the contract to receive one-fourth of the contingency fee, unless it was terminated without cause.[8] With regard to that allegation, we likewise find that the defendants negated an essential element of Hill Boren's claim that it was terminated without cause by pointing to evidence that "tend[ed] to disprove an essential factual claim made by the nonmoving party." *Martin*, 271 S.W.3d at 84. The defendants submitted evidence that Mr. Hamm lost confidence in Hill Boren, for reasons that were objectively reasonable, and that he discharged Hill Boren on that basis. The burden then

---

[8] We note that during the trial court proceedings, Hill Boren argued that the contract continued after Hill Boren's termination in September 2008 to the extent that the contract was between the two law firms. At numerous points during the proceedings, Hill Boren claimed that it was entitled to a 25% "referral fee" because the case originated with Hill Boren. On appeal, Paty, Rymer, & Ulin argued that a referral fee was never agreed upon, and that in any event, a referral fee would be contrary to Tennessee Supreme Court Rule 8 and Rule of Professional Conduct 1.5(e). In its reply brief, Hill Boren stated that it is not seeking a referral fee. Therefore, we will not address the matter further in this opinion.

shifted to Hill Boren to establish that a genuine issue of material fact existed.

Hill Boren argued in response to the defendants' motion for summary judgment that "[t]he fact that Krenis was terminated . . . does nothing to modify or effect Hill Boren's ability to enforce the Contract, because Hill Boren was fired *without cause*." In an attempt to demonstrate its point, Hill Boren cited numerous portions of depositions as well as exhibits.[9] On appeal, Hill Boren continues to argue that Mr. Hamm terminated its services without cause, or at the very least, there are genuine issues of material fact regarding the "true reason" for Mr. Hamm's decision, and whether his actions were objectively reasonable.

Hill Boren first argues that there is a genuine issue of material fact regarding whether Mr. Hamm actually did lose confidence in Attorney Krenis. Hill Boren points out that after Mr. Hamm's first "termination" letter in July 2008, the parties spoke by telephone, and Mr. Hamm agreed to allow Hill Boren to continue representing him. Hill Boren correctly notes that it was after Mr. Hamm's bad experience with Hill Boren's disability attorney that Mr. Hamm wrote the second termination letter in September 2008. Thus, Hill Boren argues that there is a genuine issue of material fact as to whether Mr. Hamm was actually dissatisfied with Mr. Krenis, or whether he was simply dissatisfied with the disability attorney. Hill Boren argues that it was "unfair" for Mr. Hamm to terminate Attorney Krenis based on his perceived mistreatment by a separate attorney involved with a separate matter (i.e., the disability claim). Thus, according to Hill Boren, there is a genuine issue of material fact regarding the "true reason" for Mr. Hamm's decision and whether he actually lost confidence in Attorney Krenis.

We fail to see the significance of the point argued by Hill Boren. Mr. Hamm signed a contract agreeing to be represented by Hill Boren, not just Attorney Krenis. Shortly after the contract was signed, Hill Boren sent a letter to Mr. Hamm stating, "You are being represented by our law firm as a whole." When Mr. Hamm sought assistance from the attorney at Hill Boren who handled disability claims, the attorney assured him that he would

---

[9] The trial court resolved the motion for summary judgment on a different ground. Its order states:

> The parties spend much time arguing about whether Mr. Hamm had cause to terminate Hill Boren; or if he really did terminate Hill Boren; and, if Hill Boren was terminated with or without cause, to what fee are they entitled. The Court finds it unnecessary to resolve these issues, because the Court is of the opinion that Mr. Krenis, on behalf of Hill Boren, settled the outstanding fee issue.

On appeal, the parties have continued to dispute whether Hill Boren was terminated with or without cause as it impacts the fee to which it was entitled. Therefore, we have analyzed the case on these grounds although they differ from the one relied upon by the trial court.

review his case over the weekend and speak with him on the following Monday, July 21. Mr. Hamm left several messages for the attorney that day and never received any response. Nearly two weeks later, on August 2, he received a certified letter stating that the attorney could not help him with his claim. The firm's disability attorney did not assist Mr. Hamm in submitting a disability claim or refer him to another attorney who could help him do so. This occurred despite the fact that the Hill Boren firm advertised that it was knowledgeable and experienced with regard to railroad worker injury claims.[10] Hill Boren admits in its brief on appeal that "Hamm felt that he was mistreated" by the firm's disability lawyer. It is our opinion that Mr. Hamm's dissatisfaction with his treatment during this experience clearly establishes that he actually lost confidence in the Hill Boren law firm. We are not aware of any reason why Mr. Hamm would be limited to terminating Hill Boren based only upon the actions of Attorney Krenis.

We also note that Mr. Hamm testified that he wrote the second letter, terminating Hill Boren in September 2008, solely due to his dissatisfaction with Attorney Krenis's handling of his FELA matter, not because of the matter involving the disability claim. During his deposition, Mr. Hamm acknowledged his frustration with the handling of his disability matter but testified that he did not blame Attorney Krenis for the other attorney's actions. In Mr. Hamm's second termination letter, he discussed his experience with the firm's disability attorney but stated in a separate paragraph: "I am very dissatisfied with the lack of attention that I have received and have come to the decision that I will feel better served if you would honor my previous request and dismiss yourself from my case." Mr. Hamm testified that the reference in his letter to being "dissatisfied with the lack of attention that I have received" was attributable to his dissatisfaction with Attorney Krenis, not the other attorney. He explained that after he spoke with Attorney Krenis in July 2008, in response to the first termination letter, he was assured that Attorney Krenis would return his calls in the future, but nothing changed. Mr. Hamm testified that he called Attorney Krenis six to seven times between mid-July and mid-September, and Attorney Krenis never once returned his call.

In sum, we reject Hill Boren's assertion that a genuine issue of material fact exists regarding whether Mr. Hamm actually lost confidence in its relationship with Hill Boren. Even assuming *arguendo* that there is a dispute as to whether the "true reason" for Mr. Hamm's decision was his dissatisfaction with Attorney Krenis or his dissatisfaction with the firm's disability attorney, we conclude that this allegedly disputed fact is not material. As explained in **Byrd**, 847 S.W.2d at 215, "to preclude summary judgment, a disputed fact must

---

[10] Due to the fact that Mr. Hamm had been employed as a railroad worker, any disability claim that he had needed to be submitted to the Railroad Retirement Board (RRB), rather than the Social Security Administration. Attorney O'Dwyer later referred Mr. Hamm to an attorney in Nashville, Tennessee who specialized in RRB disability claims and was able to procure RRB disability benefits for Mr. Hamm.

be 'material'. A disputed fact is material if it must be decided in order to resolve the substantive claim or defense at which the motion is directed." It is undisputed that Mr. Hamm felt mistreated by *at least* one attorney at Hill Boren, and we find this fact sufficient to demonstrate that Mr. Hamm actually, subjectively, lost confidence in its relationship with Hill Boren. *See* **Rose**, 115 S.W.3d at 486 (recognizing "the client's right to discharge the attorney whenever the client ceases to have absolute confidence in the relationship").

Next, we must address Hill Boren's assertion that a genuine issue of material fact exists regarding whether Mr. Hamm's decision to terminate Hill Boren was objectively reasonable. Again, the client is required to prove "that his reasons for the loss of confidence leading to the attorney's discharge were objectively reasonable." **Rose**, 115 S.W.3d at 487. We are mindful that termination for cause "does not necessarily suggest bad faith, incompetence, or neglect."[11] **McGee**, 1999 WL 824298, at *2. For example, in **McGee**, it was held that clients had cause to terminate their attorney when, following discovery, they had a disagreement over the value of the clients' claim. **Id.** at *1. "The right of a client to change his attorney at will is based on necessity in view of both the delicate and conditional nature of the relation between them and of the evil engendered by friction or of distrust." **Chambliss, Bahner & Crawford**, 531 S.W.2d at 109. As noted above, "The relation between attorney and client is such that the client is justified in seeking to dissolve that relation whenever he ceases to have absolute confidence in either the integrity, the judgment, or the capacity of the attorney." **Sowell**, 2006 WL 568238, at *2.

On appeal, Hill Boren points to various documents in the record, such as letters from Attorney Krenis to defense counsel and discovery responses, which demonstrate that Hill Boren was in fact doing some work on Mr. Hamm's case during the relevant timeframe. But, as Mr. Hamm explained during his deposition when he was shown these same documents, Mr. Hamm was not dissatisfied with Hill Boren's legal services, he was dissatisfied with their *lack of communication* about their services. Mr. Hamm said he never *knew* that Hill Boren had taken these actions because he was not made aware of any efforts they made on his behalf or anything else that was happening in the case. When Mr. Hamm was asked if there was a "tipping point" that led him to discharge Hill Boren, he could not point to any one specific event but said his dissatisfaction simply built up over time. He explained, "I can only call so much and ask for someone – I hired Mr. Krenis. I asked for Mr. Krenis to return my phone calls, and that's all I wanted. I could not communicate with him. I could communicate with [his assistant]. [She] could tell me this or she could tell me that, but I

_____

[11] We note, however, that "misconduct of an attorney in violation of a statute or acts against public policy, or in breach of the attorney's fiduciary duty to the client may support a complete forfeiture of fees, depending on the particular facts and circumstances of the case." **Rose**, 115 S.W.3d at 486 (citing *Crawford*, 656 S.W.2d at 364-65).

needed to speak to Mr. Krenis." Mr. Hamm testified that he terminated Attorney Krenis because of his prolonged dissatisfaction with the lack of communication between himself and Attorney Krenis. We find that lack of communication provides an objectively reasonable basis for terminating an attorney even if the attorney was otherwise competently performing his legal duties. *See Gupton*, 2012 WL 4358184 (finding that clients articulated objectively reasonable reasons for their loss of confidence in their attorney when they testified that, among other things, they believed their attorney "was not attentive to them in terms of adequate communication").

Hill Boren next argues that there is a genuine issue of material fact as to whether the reasons for Mr. Hamm's loss of confidence were objectively reasonable because Attorney Krenis, during his deposition, characterized Mr. Hamm as a "needy" client who asked the same questions every time he called. Hill Boren points out that Mr. Hamm called Attorney Krenis one to three times per month, always asking to speak with him rather than his assistant. Attorney Krenis testified that "we," presumably, Attorney Krenis and his assistant, were answering Mr. Hamm's questions "time and time again," and "at some point, it became pointless to give him the same answers over and over again, which he wasn't hearing." Significantly, however, Hill Boren does not point to any evidence to rebut Mr. Hamm's testimony that Attorney Krenis only returned approximately ten percent of Mr. Hamm's telephone calls. When Attorney Krenis was asked how many times he, personally, spoke with Mr. Hamm, as opposed to his assistant, he replied, "I couldn't give you a number. I don't know." Attorney Krenis also testified that, although Mr. Hamm was "needy" and "somewhat irritating" in the frequency of his calls, "it was nothing, quite frankly, originally that was out of the ordinary for what I consider a, you know, a needy client." Attorney Krenis explained that some clients call, "virtually, never," and "[w]e have some that call more and so forth. He would fall into that percentage that was what I just term needy." He explained that Mr. Hamm was "upset, frustrated with the law, with the system," but, he added, "It was nothing uncommon. I would say about 30 to 40 percent of our clients either don't understand the law or are just frustrated with their life situation, which is understandable." We find that this evidence regarding Mr. Hamm being a "needy" client did not establish that the reason for Mr. Hamm's loss of confidence in Hill Boren – Attorney Krenis's failure to return his calls – was objectively unreasonable.

Although Hill Boren did not present affirmative evidence to contradict Mr. Hamm's testimony with regard to the frequency of the communication between Mr. Hamm and Attorney Krenis, Hill Boren argues that Mr. Hamm's entire testimony is "suspect" because of his testimony about three particular instances. In Mr. Hamm's "first termination letter" to Attorney Krenis in July 2008, he stated, "As you are surely aware we have not communicated in over a year personally." Mr. Hamm testified during his deposition that he had spoken with Attorney Krenis on one occasion about six months prior to this letter, and

Mr. Hamm explained to Attorney Krenis at that time that he was "extremely unhappy" about not being able to speak with Attorney Krenis when he called. So, Mr. Hamm admitted that there was a misstatement in his July 2008 letter, and that he did have one conversation with Attorney Krenis during the preceding year. Mr. Hamm testified that he called Hill Boren approximately once a month during that time.

The second occasion cited by Hill Boren involved an email sent by Mr. Hamm to Attorney Krenis in July 2007 with the subject line, "long time no hear," and the following message: "just wanted to check in and see if there was anything new. call me." Attorney Krenis testified that when this email was sent, he had actually spoken with Mr. Hamm during the preceding week. Mr. Hamm was asked about the email during his deposition, and he testified that he did not recall speaking with Attorney Krenis around July of 2007.

We conclude that these two instances do not establish that the reason for Mr. Hamm's loss of confidence in Attorney Krenis were objectively unreasonable. To the contrary, they evidence Mr. Hamm's dissatisfaction with the parties' communication and demonstrate his continued attempts to communicate with Attorney Krenis. Mr. Hamm did not testify that he *never* spoke to Attorney Krenis during the two-and-a-half-year attorney-client relationship. He testified that Attorney Krenis "sometimes" returned his calls but "not very often," maybe one out of every ten times. Notably, Hill Boren does not challenge Mr. Hamm's testimony that he and Attorney Krenis had only *one* conversation in the year prior to the first termination letter, and during that conversation, Mr. Hamm expressed his displeasure with the parties' lack of communication.

Hill Boren points to one other "dispute" regarding a communication between the parties. In the September 2008 letter Attorney Krenis wrote in response to Mr. Hamm's second termination letter, Attorney Krenis wrote, "Nothing has changed since we last spoke. At that time, I expressed my apologies for your experience with Mr. Hartup." Thus, Hill Boren claims that this letter proves that Attorney Krenis and Mr. Hamm did speak during the timeframe between the two termination letters written by Mr. Hamm. When asked about this discrepancy, Mr. Hamm testified that he never spoke directly with Attorney Krenis about his experience with Mr. Hartup, the disability attorney, because when he called to express his disappointment about the matter, he only spoke with the assistant. Nevertheless, even assuming that Attorney Krenis did have one direct conversation with Mr. Hamm about his perceived mistreatment by Mr. Hartup, this would not establish a genuine issue of material fact regarding whether the reasons for Mr. Hamm's loss of confidence in Hill Boren were objectively reasonable.

"A disputed fact presents a genuine issue if 'a reasonable jury could legitimately resolve that fact in favor of one side or the other.'" *Martin*, 271 S.W.3d at 84. In other

-18-

words, "[i]f reasonable minds could justifiably reach different conclusions based on the evidence at hand, then a genuine question of fact exists." *Green*, 293 S.W.3d at 514. "If, on the other hand, the evidence and the inferences reasonably drawn from the evidence would permit a reasonable person to reach only one conclusion, then no material factual dispute exists, and the question can be disposed of as a matter of law." *Id.* Even viewing the evidence in the light most favorable to Hill Boren, we conclude that a reasonable person could reach but one conclusion – that the reasons for Mr. Hamm's loss of confidence in Hill Boren were objectively reasonable. In response to the defendants' motion for summary judgment, Hill Boren, as the nonmoving party, was required to produce evidence of specific facts establishing that genuine issues of material fact existed. *Martin*, 271 S.W.3d at 84. Hill Boren did not point to evidence creating a genuine issue of material fact. The undisputed evidence establishes that there was a communication problem between Mr. Hamm and Attorney Krenis, and that the reasons for Mr. Hamm's loss of confidence in Hill Boren were objectively reasonable. For example, Hill Boren fails to dispute Mr. Hamm's claim that Attorney Krenis never informed him of any efforts that were made to resolve the problem Mr. Hamm encountered with his medical bills. Hill Boren simply argues that it was "impossible" for Attorney Krenis to fulfill such a request because the employer was not legally required to pay the bills. That is not the point, however. Mr. Hamm acknowledged his awareness that Hill Boren might not be successful in its attempt to resolve the matter. Mr. Hamm's complaint was that Attorney Krenis never told him about any efforts made on his behalf, so Mr. Hamm "didn't know if anything was being done or not."

Because Mr. Hamm's loss of confidence was rooted in an objectively reasonable basis, his termination of the Hill Boren law firm was for cause. Consequently, Hill Boren was limited to recovering quantum meruit in this case. It was not entitled to recover the full contract amount of one-fourth of the contingency fee.[12]

---

[12] This result is also consistent with the terms of the parties' contract, which provided:

> In the event the case is settled without the advice of the ATTORNEYS, should CLIENTS seek alternative representation, or should the ATTORNEYS' contingency fee not be paid for any reason, ATTORNEYS shall have a right to quantum meruit recovery based on ATTORNEYS' hourly rate applicable at the time of the settlement or other disposition. This equitable relief is to avoid unjust enrichment of the CLIENTS should CLIENTS determine that the services of the ATTORNEYS are no longer beneficial.

Clearly, Mr. Hamm determined that the services of Hill Boren were no longer beneficial, and he accordingly sought to be represented in an alternative manner that was not contemplated by the parties' original contract. He ended the joint representation and was represented solely by Paty, Rymer, & Ulin thereafter. We reject Hill Boren's argument that Mr. Hamm could only seek "alternative representation" by discharging both Hill Boren and Paty, Rymer, & Ulin and hiring someone entirely new to the case, as we find this to be a strained

(continued...)

We note that Hill Boren argues on appeal that "a motion for summary judgment that is only supported by an interested party's own self-serving statements cannot succeed, because the defendant's 'interest in the outcome of the case alone is sufficient to create an issue of fact for the jury.'" *See Anderson v. Mason*, 141 S.W.3d 634, 637 (Tenn. Ct. App. 2003)). It also cites caselaw to the effect that "'uncontradicted evidence will not entitle a party . . . to a summary judgment, when the credibility of the evidence has been called into question using one of the legal modes available to test the credibility of witnesses.'" *See Knapp v. Holiday Inns, Inc.*, 682 S.W.2d 936, 942-43 (Tenn. Ct. App. 1984). Hill Boren claims that because it raised a question as to Mr. Hamm's credibility, with regard to the three instances mentioned above, none of Mr. Hamm's testimony can provide the basis for granting summary judgment in favor of the defendants. In other words, Hill Boren argues that we cannot accept Mr. Hamm's testimony about his reasons for terminating Hill Boren.

At first blush, the quotations cited above would appear to preclude summary judgment based on Mr. Hamm's testimony. However, the cited principle is not applied as broadly as Hill Boren suggests. "Doubt as to credibility of a witness for this purpose does not arise from the mere fact that the witness is a party or otherwise interested in the result." *Lewis v. Hill*, 770 S.W.2d 751, 754 (Tenn. Ct. App. 1988).[13] "The opponent to the motion for summary judgment must raise a *genuine doubt* as to witness credibility." *Bailey Tool & Mfg. Co. v. Butler*, No. M2009-00685-COA-R3-CV, 2010 WL 2073854, at *7 (Tenn. Ct. App. May 21, 2010) (citing *Knapp*, 682 S.W.2d at 942) (emphasis added). "'The credibility concerns that warrant denying a summary judgment must raise to a level higher than normal credibility questions that arise whenever a witness testifies. Any other rule would essentially prevent the courts from granting a summary judgment in any case.'" *Id.* (quoting *Hepp v. Joe B's, Inc.*, No. 01A01-9604-CV-00183, 1997 WL 266839, at *3 (Tenn. Ct. App. May 21, 1997)).

Furthermore, the opponent to the motion for summary judgment cannot merely point out any inconsistency in testimony or concern regarding a witness's credibility in order to avoid the grant of summary judgment. For instance, in *Bailey v. Tasker*, 146 S.W.3d 580, 588-89 (Tenn. Ct. App. 2004), the Court of Appeals affirmed summary judgment in favor of a defendant doctor despite the plaintiff's challenge to his credibility. The plaintiff argued that the defendant doctor's testimony regarding the standard of care could not be the basis

---

[12](...continued)
interpretation of the contract.

[13] The *Lewis* Court explained that, "The [*Knapp*] opinion," cited by Hill Boren, "is not authority for disregarding an uncontradicted affidavit because it is the affidavit of a party." 770 S.W.2d at 754.

for granting summary judgment because, in response to the doctor's motion for summary judgment, the plaintiff demonstrated that the doctor falsely testified in his deposition about the number of lawsuits with which he had been involved and the existence of past criminal charges against him. Thus, the plaintiff cited **Knapp** for the notion that "doubt as to the credibility of material witnesses will create a genuine issue of material fact sufficient to render granting a summary judgment improper." Nevertheless, the Court distinguished **Knapp** because, among other things, the challenged credibility of the witnesses in **Knapp** "related directly to their versions of the events of the evening in question."[14] *Id.* at 589. In contrast, the challenge to the doctor's credibility did "not go directly to the defendant's *expert* testimony regarding whether he violated the standard of care in his treatment of the plaintiff." *Id.* The credibility issue involving the doctor was "peripheral to the substance of the defendant's testimony." *Id.* Therefore, his own testimony could provide the basis for granting summary judgment in his favor. *See also* **Stewart v. Bennett**, C.A. No. 169, 1987 WL 17030, at *3 (Tenn. Ct. App. E.S. Sept. 17, 1987) (affirming summary judgment where the facts were undisputed regarding the dispositive issue on appeal, and the cited differences in testimony between affidavits and depositions related to a separate issue, as this created no "genuine doubt" concerning the witnesses' credibility).

Our Supreme Court was faced with a similar issue in **Lindsey v. Miami Development Corp.**, 689 S.W.2d 856, 862-63 (Tenn. 1985). There, the plaintiff's daughter, the decedent, either jumped or fell from a balcony during a party hosted by the defendant. The plaintiff asserted a premises liability claim against the defendant, and summary judgment was entered in favor of the defendant based on his testimony that the decedent jumped and did not fall from the balcony. Other witnesses had contradicted parts of the defendant's testimony, such as his version of what happened after the fall, but none of them actually saw the decedent fall, so they could not contradict the defendant's testimony in that regard. Accordingly, the only testimony describing how the decedent descended from the balcony was from the defendant himself. The plaintiff argued that it was inappropriate to grant summary judgment

---

[14] In **Knapp**, 682 S.W.2d at 939-43, the dispositive issue was whether there was a genuine factual dispute concerning whether the employees of a cocktail lounge served alcoholic beverages to a man when he was visibly intoxicated. The owner of the lounge moved for summary judgment and sought to show definitively that the man was not visibly intoxicated by relying on the testimony of the allegedly intoxicated man himself and one of the cocktail waitresses who served him, who happened to be the man's personal friend and former client. Despite their testimony, a blood sample taken from the man after he was involved in an accident revealed a blood alcohol concentration of 0.23%. The Court found that it was inappropriate to grant summary judgment based on the testimony of the allegedly intoxicated man and the waitress because the question of their credibility needed to be resolved at a full hearing on the merits. The Court explained that summary judgment should be denied, and the case should be decided by the trier of fact, "if the opponent to a motion for summary judgment succeeds in raising a genuine doubt concerning a witness' credibility by a sufficient showing of the witness' bias, prejudice, or interest[.]" *Id.* at 942.

based solely on the testimony of the defendant because he could be impeached by showing other inconsistencies in his testimony. The Supreme Court disagreed. The Court recognized that the defendant's testimony was "not entirely consistent with that of [other witnesses] in collateral matters." *Id.* at 862. However, the Court concluded that no issue had been "seriously raised as to [the defendant's] credibility on the factual issue" of how the decedent descended from the balcony. *Id.* at 863. The Court explained:

> [T]he party opposing summary judgment must be able to point to some facts which may or will entitle him to judgment, or refute the proof of the moving party in some material portion, and . . . the opposing party may not merely recite the incantation, "Credibility," and have a trial on the hope that a jury may disbelieve factually uncontested proof. *Curi v. International Business Machines Corporation*, 517 F.2d 212, 214 (5th Cir.1975) quoting with approval *Rinieri v. Scanlon*, 254 F.Supp. 469, 474 (S.D.N.Y.1966).

*Id.* The Court found that reasonable minds could draw only one conclusion from the evidence in the record – that the decedent jumped from the balcony. The Court made this conclusion even though the evidence came from the defendant himself, and it affirmed the grant of summary judgment to the defendant on the premises liability claim.

Applying these principles to the case before us, we readily conclude that the cases cited by Hill Boren do not preclude a grant of summary judgment to the defendants simply because the motion for summary judgment was based in part upon the testimony of Mr. Hamm himself. We recognize that Hill Boren did challenge Mr. Hamm's testimony with regard to three specific instances that do relate to the factual issue of the communication that took place, or failed to take place, between Attorney Krenis and Mr. Hamm. However, we find that Hill Boren did not "refute the proof of the moving party in some material portion" that would justify disregarding Mr. Hamm's entire testimony about the relationship. *See Lindsey*, 689 S.W.2d at 863. The evidence submitted by Hill Boren did not raise a genuine doubt regarding Mr. Hamm's credibility. The factual disputes raised by Hill Boren are limited to: whether the parties spoke in July 2007 around the time of the "long time no hear" email, and whether they personally spoke around September of 2008 regarding the bad experience with Mr. Hartup.[15] Assuming that the parties' did speak on these two occasions, during a two-and-a-half year attorney-client relationship, these facts would not establish that it was objectively unreasonable for Mr. Hamm to terminate Hill Boren's services for failing

---

[15] The third alleged "dispute" was not actually disputed. Mr. Hamm testified that he misspoke in his July 2008 termination letter when he said the parties had not spoken in over a year, because they had spoken on one occasion in the previous six months about his displeasure with the parties' lack of communication.

to return his calls. Again, "[n]ot all factual disputes require the denial of a motion for summary judgment. Many factual disputes are minor or are not germane to the grounds of the motion." *Green*, 293 S.W.3d at 514. The factual disputes asserted by Hill Boren were minor, and the vast majority of Mr. Hamm's testimony was undisputed. Accordingly, we conclude that Hill Boren failed to raise a genuine doubt regarding Mr. Hamm's credibility and failed to demonstrate a genuine issue of material fact in response to the defendants' properly supported motion for summary judgment.

Finally, we note Hill Boren's brief argument that the contract between Hill Boren, Paty, Rymer & Ulin, and Mr. Hamm "could not have been modified or rescinded by the September 18, 200[8] Krenis letter because there was no consideration for such a modification." Hill Boren cites general caselaw to the effect that an alteration or amendment to an existing contract must be supported by consideration. As explained above, however, Hill Boren admits that Mr. Hamm terminated its representation by his letter of September 10, 2008. Therefore, its "lack of consideration" argument is apparently premised on the assumption that the parties' contract remained enforceable even after the termination because the termination was allegedly without cause. *See Rose*, 115 S.W.3d at 485 ("Where an attorney has been discharged by his client without cause, the attorney may rescind the contract of employment and may recover on a quantum meruit for services rendered up to the date of his discharge; or he may treat the contract as continuing, although broken by the client, and may recover for the breach.") Because we have concluded that Hill Boren was terminated for cause, there was no "alteration or amendment" to an "existing contract" thereafter, and there was no requirement for "consideration" to Attorney Krenis or to Hill Boren. This issue is without merit.

For the aforementioned reasons, we affirm the trial court's grant of summary judgment in favor of the defendants on the breach of contract claim.

### B.    *Misrepresentation*

In its complaint, Hill Boren alleged that Attorney Krenis was induced to agree to a compromised sum, rather than the one-fourth contingency fee provided in the contract, based upon an alleged misrepresentation and false statement by Attorney O'Dwyer. Specifically, Hill Boren claimed that Attorney O'Dwyer told Attorney Krenis, or about June 28, 2010, that Mr. Hamm's case was "not a big case" and that there was not a lot of money involved in the settlement negotiations. Hill Boren argues that it did not receive its one-fourth share of the contingency fee as a result of its reliance on this misrepresentation. Paty, Rymer, & Ulin basically took the position that the contract was terminated when Mr. Hamm terminated Attorney Krenis and Hill Boren in September 2008, and therefore, nothing that happened thereafter was material, regardless of what representations were allegedly made, because the

amount Hill Boren could recover for its fee was already set by the contract.[16]

We agree with Paty, Rymer, & Ulin's position on this issue. As explained above, Hill Boren was not entitled to receive one-fourth of the contingency fee as provided in the original contract because Hill Boren was terminated for cause in September 2008, nearly two years before the settlement of Mr. Hamm's case. Any alleged misrepresentation about the value of the case in June 2010 did not cause Hill Boren to agree to a sum less than it was entitled to receive. Hill Boren was only entitled to receive quantum meruit for its services under the provisions of the parties' contract and under Tennessee law. Thus, Paty, Rymer, & Ulin negated an essential element of Hill Boren's misrepresentation claim, i.e., that the alleged misrepresentation caused damages to Hill Boren. *See **Stanfill v. Mountain***, 301 S.W.3d 179, 188 (Tenn. 2009) (stating that an essential element of a claim for intentional misrepresentation is that the "plaintiff suffered damage as a result of the misrepresentation"); ***Bennett v. Trevecca Nazarene University***, 216 S.W.3d 293, 300-301 (Tenn. 2007) (explaining that the law of negligent misrepresentation subjects one to liability "for pecuniary loss caused to [others] by their justifiable reliance upon the information" supplied by the defendant). Finding no genuine issue of material fact regarding the element of causation, we affirm the trial court's grant of summary judgment to Paty, Rymer, & Ulin on the misrepresentation claims.

### C. Intentional Interference with a Business Relationship & Procurement of Breach of Contract

As the basis for these claims, Hill Boren basically alleged that Paty, Rymer & Ulin intentionally procured a breach of contract by "renegotiating a contract of representation between itself and Hamm, reducing the contingency rate to 33%, and allegedly eliminating any monies due Plaintiff pursuant to The Contract[.]" Notably, Hill Boren's complaint did not allege that Attorney O'Dwyer took any action to cause Mr. Hamm to terminate Attorney Krenis in 2008.[17] Instead, it argued that she interfered with Hill Boren's contract when she

---

[16] The trial court concluded that, even assuming that a misrepresentation was made, the alleged reliance by Attorney Krenis was not justifiable or reasonable. The court pointed out that Attorney Krenis was "a lawyer of some experience," and his young client had significant injuries with a 28% impairment rating, and an estimated economic loss for past and future wages of over $1.5 million. Thus, the Court found that "[f]or him to think the case was not 'big' or to simply rely on that alleged statement is not reasonable." The court found "no reason to believe that he could not roughly evaluate the case" because a FELA case is "not that complicated." Again, because of the numerous alternative arguments presented by the parties, we have resolved this issue on a different ground than the trial court.

[17] Hill Boren's brief on appeal also emphasized that Hill Boren was not claiming that Mr. Hamm
(continued...)

-24-

"renegotiated" and reduced the contingency fee during the second mediation. In apparent recognition of this distinction, the trial court noted that there was no evidence that Mr. Hamm acted at the suggestion of Attorney O'Dwyer or Paty, Rymer & Ulin. With regard to these causes of action, the trial court's order granting summary judgment also stated:

> Plaintiff asserts that PR&U's reduction of its fee to settle the FELA case (from 40% to 33%) somehow factors in the analysis of these two causes of action. This assertion ignores the chronology of when the reduction of the fee took place and the clear motivation for the reduction of the fee. There is simply no thread connecting the later fee reduction to these asserted causes of action.

We agree with the court's observation. Hill Boren is basically asserting that a tortious interference with its contract occurred *after* it was terminated in September 2008. Like the previous claim for misrepresentation, Hill Boren's allegations with regard to these causes of action were based on the premise that the contract between the three parties remained in effect after the September 2008 termination. This can be seem from Hill Boren's argument on appeal that Attorney O'Dwyer intentionally interfered with Hill Boren's business relationship with Mr. Hamm when, "during the second mediation," she "renegotiated an oral contract of representation between [Paty, Rymer & Ulin] and Hamm . . . reducing the contingency rate to 33% and allegedly eliminating any monies due to Plaintiff pursuant to the Contract," because "the Contract was still in force and effect." Hill Boren again claims that "the result" of the renegotiation of the contract during the second mediation was "that Plaintiff [Hill Boren] did not receive the fee due to it pursuant to the Contract."

We conclude that Hill Boren's claims for interference with a business relationship and procurement of breach of contract are subject to the same fate as its claims for misrepresentation. Paty, Rymer, & Ulin has negated an essential element of these claims by demonstrating that Attorney O'Dwyer's reduction of her fee during mediation did not cause damages to Hill Boren or result in a breach of contract. *See Trau-Med of America, Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002) (stating that the tort of intentional interference with business relationships requires "damages resulting from the tortious interference"); *Federated Rural Elec. Ins. Exchange v. Hill*, No. M2005-02461-COA-R3-CV, 2007 WL 907717, at *13 (Tenn. Ct. App. Mar. 26, 2007) (explaining that in order to recover for procurement of breach of contract, a plaintiff must prove, among other things, "a breach of contract," that "the act complained of [was] the proximate cause of the breach of contract," and "damages resulting from the breach of contract"). Because the contract with Hill Boren had already been terminated by Mr. Hamm, for cause, in September 2008,

---

[17](...continued)
terminated its services at the suggestion of Attorney O'Dwyer.

Hill Boren was no longer entitled to one-fourth of the contingency fee, and Attorney O'Dwyer's decision to reduce her contingency fee during the June 2010 mediation did not interfere with Hill Boren's contract or procure a breach of Hill Boren's contract with Mr. Hamm. Summary judgment was properly granted as to both of these claims.

### D. *Punitive Damages*

Because we have affirmed the trial court's grant of summary judgment to the defendants on Hill Boren's other causes of action, we likewise find that Hill Boren cannot sustain its claim for punitive damages. *See Jenkins v. Brown*, No. M2005-02022-COA-R3-CV, 2007 WL 4372166, at \*13 (Tenn. Ct. App. Dec. 14, 2007) ("In Tennessee, there can be no claim for punitive damages alone. Thus, without an award of compensatory damages or any other sort of remedial relief, an award of punitive damages cannot stand."); *B & L Corp. v. Thomas and Thorngren, Inc.*, 162 S.W.3d 189, 223 (Tenn. Ct. App. 2004) ("a party is entitled to recover punitive damages only if there is an award of actual damages"); *Oakley v. Simmons*, 799 S.W.2d 669, 672 (Tenn. Ct. App. 1990) ("there can be no cause of action for punitive damages alone"). All other issues are pretermitted.

### V. CONCLUSION

For the aforementioned reasons, we affirm the decision of the chancery court. Costs of this appeal are taxed to the appellant, Hill Boren, P.C., and its surety, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.